BANK ONE, TEXAS, N.A., Bonnet Resources Corporation, Trendmaker, Inc., and Weyerhaeuser Real Estate Company, Appellants,

v.

Maco STEWART and Leisure Resorts, Inc., Appellees.

No. 14–93–00899–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 29, 1998.

Rehearing Overruled March 26, 1998.

---

424

H. Miles Cohn, Lynne Liberato, Jeff Nobles, Maria Teresa Arguindegui, Brendan D. Cook, Houston, for appellants.

M.H. Cersonsky, Michael C. O'Connor, Mynde S. Eisen, John H. Bennett, Jr., Houston, for appellees.

Before LEE, HUDSON and EDELMAN, JJ.

## OPINION ON MOTION
## FOR REHEARING

HUDSON, Justice.

On consideration of appellant's motion for rehearing, we withdraw the majority and concurring opinions of June 26, 1997, and substitute the following opinion.

Appellants, Bank One, Texas, N.A., Bonnet Resources Corporation, Trendmaker, Inc., and Weyerhaeuser Real Estate Company appeal from a $17,000,000 judgment arising out of the sale of a defaulted note to a maker of a collateral note securing the defaulted note, and the subsequent foreclosure of the collateral note. In eighteen points of error, Bank One, Texas, N.A. and Bonnet Resources (collectively "Bank One") assert the trial court erred in submitting jury questions and granting judgment regarding an alleged breach of a bailment agreement, breach of the duty of good faith and fair dealing, conspiracy to commit fraud, and failure to comply with

Section 9.207(a) of the Texas Business and Commerce Code. Bank One also challenges the legal and factual sufficiency of the evidence to support the judgment and to award actual and exemplary damages as well as attorney fees. In addition, Bank One asserts the trial court made errors in the submission of the jury charge.

In eight points of error, Trendmaker asserts the trial court erred in submitting jury questions and entering judgment on claims of breach of a bailment agreement, tortious interference with a contract, breach of the duty of good faith and fair dealing, conversion, civil conspiracy to commit fraud and commercial unreasonableness, and in awarding actual and punitive damages and attorney fees.

In twenty-nine points of error, Weyerhaeuser Real Estate Company (Weyerhaeuser) asserts the trial court erred in submitting jury questions and entering judgment on findings that it committed fraud, engaged in a civil conspiracy to commit fraud, tortiously interfered in a business relationship, and acted with malice. Weyerhaeuser also challenges the legal and factual sufficiency of the evidence to support the judgment related to these claims and asserts error in the submission of erroneous instructions and questions related to corporate identity, damages, attorney fees, and prejudgment interest. In addition, Weyerhaeuser contends the trial court erred in refusing its proposed instructions, entering judgment on the basis of jury findings against Trendmaker and Bank One, excluding evidence, and admitting the testimony of an undisclosed expert witness.

Appellee Maco Stewart (Stewart) brings two cross-points complaining of the award of attorney fees and asking for recovery under the theory providing the greatest relief. Appellee Leisure Resorts, Inc. (LRI) brings three cross-points complaining of the award of attorney fees, the calculation of prejudgment and postjudgment interest and the trial court's refusal to rescind the Trendmaker foreclosure sale. We reverse and render.

## I. Background
### A. Stewart Sells Bay Colony to LRI

In 1984, Stewart sold two large tracts of an 890 acre tract of real estate known as Bay Colony to two companies owned by Tyler Todd (Todd), namely, Todd Development Company (TDC) and TDT Development Company. TDT Development Company, which later became LRI,[1] purchased the northern tract and TDC purchased the southern tract of Bay Colony. Stewart retained a purchase money lien on the northern tract to secure repayment of $1,500,000 of financing that he provided to LRI. Stewart's interest in Bay Colony was subordinate to a first lien held by Ameriway Savings Association (Ameriway) securing a $1,650,000 loan to LRI.

### B. LRI Sells Bay Colony to the Midlands Associates

On March 25, 1985, LRI sold its interest in Bay Colony to the Midlands Associates, a joint venture consisting of Trendmaker and Commonwealth Realty Development Company (Commonwealth Realty). As partial payment of the purchase price, the Midlands Associates executed a promissory note for $9,031,214 (the Midland Note) in favor of LRI, secured by the northern tract of Bay Colony.[2] At the same time, LRI endorsed and collaterally assigned the Midland Note to Ameriway, which advanced additional money to LRI and TDC (the Ameriway Note).[3] The joint venturers to the Midlands Associates and their parent corporations[4] executed a letter to LRI, TDC and Ameriway guaran-

---

1. For the sake of clarity, we refer to TDT Development Company as LRI.

2. The Midlands Associates executed another note to purchase Todd Development Company's interest in Bay Colony, but that note s not at issue in this case.

3. Ameriway extended a $10,500,000 line of credit to LRI and TDC. LRI received $6,846,749 and TDC received $3,653,231 from Ameriway. MBank participated in a line of credit agented by

Ameriway to LRI in December, 1985, for $3,999,900. Commonwealth also participated in the Ameriway loan to the extent of $2,846,769 and Ameriway participated to the extent of $1,000.

4. The parties signing the letter were Trendmaker and its parent corporation, Weyerhaeuser, and Commonwealth Realty and its parent, Commonwealth Savings Association.

teeing each joint venturer's obligation to make capital contributions to the Midlands Associates. On the same day, LRI restructured its prior debt to Stewart by executing another promissory note in favor of Stewart for $1,450,000 (the Stewart Note), secured by a second lien in the Midland Note. By letter, Ameriway, Stewart, and LRI acknowledged Stewart's status as a subordinate secured party in the Ameriway Note and agreed that Ameriway would act as bailee for Stewart.[5]

### C. Trendmaker and Commonwealth Restructure their Joint Venture Relationship

The Midlands Associates began to develop Bay Colony. Trendmaker provided the expertise in development and Commonwealth provided the financing. Nevertheless, on May 18, 1988, Trendmaker and Commonwealth Realty terminated their joint venture relationship in the Midlands Associates and in another joint venture entity. In exchange [6] for Commonwealth's interest in the other joint venture entity, Trendmaker assigned its interest in the Midlands Associates and its assets to Commonwealth Realty. Thus, Commonwealth Realty and another Commonwealth entity became the sole owner of the Midlands Associates and its assets, including the northern tract of Bay Colony. As consideration for the assignment, Commonwealth Realty "assumed full payment of all of the debts and obligations of Midlands Associates." Commonwealth also agreed to indemnify Trendmaker for its liabilities relating to the Midland Note.

5. Ameriway further agreed as follows:

> [I]in addition to acting on our own behalf, and should our first and superior security interest in the Notes be finally discharged by whatever means, and you still hold your subordinate and inferior security interest in the Notes, we will use our best efforts to deliver said Notes to you instead of to the makers thereof; provided, however, you hereby agree that we shall have no liability to you whatsoever in the event we fail to deliver said Notes to you pursuant to the terms hereof due to our simple negligence.

6. In addition to exchanging interests in joint ventures, Trendmaker and Commonwealth Realty exchanged cross releases and indemnities.

### D. MBank Replaces Ameriway and LRI Restructures Debt with MBank

A short time later, Ameriway resigned as lead agent on the Ameriway Note. On June 3, 1988 Ameriway assigned to MBank an interest in the Ameriway Note and its collateral, the Midlands Note.[7] Consequently, MBank, Houston, N.A. became the lead lender and Commonwealth Savings a participant lender on the LRI Note. LRI restructured its debt and executed a commercial revolving credit note in favor of MBank [8] for $5,719,769 (the LRI Note). At this time Todd became aware that Trendmaker was no longer a partner in the Midlands Associates.

By letter agreement, MBank acknowledged Stewart's status as a subordinate secured party in the Midland Note under the terms governing LRI's assignment of the Midland Note to Ameriway on March 25, 1985. In the same letter, Stewart agreed his interest in the Midland Note would remain subordinate to MBank's interest even if the Stewart loan was renewed, extended or rearranged. Subject to those terms, MBank agreed to act as bailee for the Stewart Note solely for the purpose of perfecting Stewart's security interest in the Midland Note (the Bailment Agreement). On June 1, 1988, LRI directed MBank by letter to disburse the proceeds remaining after payment of the LRI Note, from the funds MBank received from the Midlands Associates, to Stewart for payment due on the Stewart Note (the Collection Letter).

### E. Bank One Acquires the LRI Note

7. In the Loan Agreement executed pursuant to the revolving line of credit, MBank required LRI to cause Ameriway to endorse and deliver the Midland Note to MBank as a condition precedent to advancing funds to LRI. In the same agreement, LRI warranted that it had made no verbal or written agreements that would give rise to any security interest in the Midland Note except an assignment to Stewart to secure the Stewart loan "so long as such collateral assignment and security interest are expressly subject and subordinate to the collateral assignment of and security interest granted in such Collateral Note to Lender pursuant to the Security Instruments."

8. Commonwealth Saving was a 30% participant lender on the LRI Note.

In 1989, MBank failed [9] and Bank One was formed to purchase MBank's assets. Pursuant to a Purchase and Assumption Agreement effective March 28, 1989, Bank One acquired MBank's seventy percent interest in the LRI Note.[10] Bank One's subsidiary and agent, Bonnet Resources, handled the LRI Note and its collateral, the Midland Note, on behalf of Bank One. Bonnet collected payment on the Midland Note from Commonwealth Savings and distributed funds remaining after payment of the LRI Note according to Todd's instructions in the Collection Letter to MBank.

### F. The Midlands Associates Default on the Midland Note

Also in 1989, Todd filed for personal bankruptcy and his other company, TDC, filed for corporate bankruptcy. Commonwealth Savings Association, the parent corporation of Commonwealth Realty, failed and came under control of the Resolution Trust Corporation (the RTC). The Midlands Associates, comprised of Commonwealth Realty and other Commonwealth entities but controlled by the RTC, defaulted on its December 1989 payment on the Midland Note. As a result of the Midland default, LRI defaulted on both the LRI Note and the Stewart Note.

In early 1990, Bank One initiated collection of the LRI Note through its agent and affiliate, Bonnet Resources. After meeting with Todd, Bank One agreed to forego adverse action against LRI for sixty days while LRI pursued collection of the Midland Note. Instead of pursuing Trendmaker, Todd unsuccessfully directed his efforts primarily to marketing Bay Colony to potential buyers.[11]

During the moratorium, both Stewart and Trendmaker approached Bank One about purchasing the LRI Note.[12] Stewart declined to make an offer on the LRI Note because he was unable to obtain financing, but invited Bank One to join him in suing Trendmaker and Weyerhaeuser to recover on the Midland Note. Bank One rejected Trendmaker's initial offer but informed Trendmaker that it would seriously entertain "a proposal encompassing a discount of 5% to 10% of the outstanding balance" due on the LRI Note. In the meantime, Stewart filed suit against Trendmaker, Weyerhaeuser, the Commonwealth entities, and the Midlands Associates, and joined LRI, Bank One and Bonnet Resources as involuntary plaintiffs and defendants.

At the close of the sixty-day moratorium, Bank One extended an offer to sell the LRI Note to Trendmaker for $2,850,000. Negotiations continued but to no avail. Bank One's offer expired. Soon thereafter, Stewart's suit was removed to federal court.

After attempting for many months to restructure the LRI obligation and to sell Bay Colony, Bank One scheduled a foreclosure sale of the Midland Note for February 8, 1991. On the eve of the foreclosure, LRI, financed by Trendmaker, filed for bankruptcy protection, which stayed the foreclosure sale. The bankruptcy plan proved unsuccessful and the stay was lifted. In the spring of 1991, Trendmaker approached Bank One about purchasing the LRI Note. In July 1991, Bank One sold its interest in the LRI Note and assigned its interest in the Midland Note to Trendmaker for $2,750,000. In August 1991, Trendmaker purchased the Midland Note at foreclosure sale and subsequently foreclosed on and purchased, Bay

9. Federal regulators closed MBank in March 1989 and appointed the Federal Deposit Insurance Corporation (the FDIC) as receiver for MBank.

10. Commonwealth Savings, now under control by the RTC, owned a thirty percent interest in the LRI Note as a participant lender.

11. Todd testified that "[d]uring the period I was in bankruptcy after the default all my efforts were to marketing the note while I still had control over it." He later explained that he meant marketing the property. He said he con-

sidered Trendmaker an ally and was trying to get Trendmaker to help market the property. Sam Hathorn, Trendmaker's president, testified that Todd faxed a copy of Bank One's letter consenting to a sixty-day moratorium and that Todd suggested that Hathorn talk to Bank One. Todd also discussed Trendmaker purchasing the LRI Note with Hathorn.

12. During the moratorium, Bank One analyzed its options to collect on the LRI Note, and concluded it would obtain the highest recovery by selling the note to a third party for $2,850,000.

Colony. A few weeks later, the federal court remanded Stewart's suit to state court. In early 1992, Trendmaker and the RTC, as receiver for Commonwealth Savings Association and other Commonwealth entities, executed a marketing agreement to sell Bay Colony.

In early 1992, Stewart filed his First Amended Original Petition against Bank One, Trendmaker and Weyerhaeuser in state court and LRI filed an original cross-action against Trendmaker and Weyerhaeuser and the Midlands Associates. In September 1992, Stewart filed a Second Amended Original Petition asserting Bank One and Trendmaker breached (1) the Bailment Agreement, (2) the duty of good faith and fair dealing, and (3) engaged in conversion and conspiracy to defraud. Stewart also asserted that (4) Bank One violated Section 9.207 of the Texas Business and Commerce Code, and (5) Trendmaker wrongfully foreclosed on the Midland Note and (6) tortiously interfered in his relationship with Bank One. Stewart further asserted Weyerhaeuser engaged in conspiracy and tortious interference with a business relationship. Although LRI asserted no claims against Bank One, it claimed Trendmaker and Weyerhaeuser engaged in conspiracy, tortious interference, and fraud. In addition, LRI claimed Trendmaker converted and wrongfully foreclosed on the Midland Note.

The jury found in favor of Stewart and LRI on all claims except Stewart's claim of conversion against Bank One. The trial court awarded Stewart actual damages of $1,326,145.20, including prejudgment interest, exemplary damages of $3,000,000, attorney fees of $464,150.82, and postjudgment interest. The trial court also awarded LRI actual damages of $3,874,600.11, including prejudgment interest, exemplary damages of $6,000,000, attorney fees of $1,356,110.04, and postjudgment interest.

## II. Pleading Defects

■ In its third point of error Bank One asserts trial error in the submission of jury questions regarding conspiracy to commit fraud and the entry of judgment on the jury's findings because Stewart did not plead a conspiracy cause of action. Likewise, in its first two points of error, Weyerhaeuser alleges error because neither Stewart nor LRI pled a cause of action for conspiracy to commit fraud and because Stewart did not plead a cause of action for tortious interference with a contract. In a case tried to a jury, the judgment must conform to the issues raised by the pleadings, the nature of the case proved, and the verdict. TEX.R.CIV.P. 301; *Texaco, Inc. v. Wolfe,* 601 S.W.2d 737, 741 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.).

■ Pleadings are to be liberally construed in favor of the pleader when the complaining party has not filed special exceptions to the pleadings. *Crockett v. Bell,* 909 S.W.2d 70, 72 (Tex.App.—Houston [14th Dist.], 1995, no writ). Pleadings shall give fair notice of the claim or defense asserted to provide the opposing party with enough information to enable him to prepare a defense or answer to the defense asserted. *Id.* (citing *Paramount Pipe & Supply Co. v. Muhr,* 749 S.W.2d 491, 494 (Tex.1988) and *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982)); TEX. R.CIV.P. 45(b), 47(a). A petition is sufficient if a cause of action or defense may be reasonably inferred from what is specifically stated. *Id.;* (citing *Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993)).

Among other allegations, Stewart's petition alleged that while Bank One was publicly telling LRI to pressure Trendmaker and Weyerhaeuser to pay the Midland Note, it was encouraging Trendmaker in secret and clandestine meetings not to cure the default on the Midland Note, but suggesting that it simply purchase the LRI Note. Stewart also alleged that Bank One disseminated information "in such a manner as to favor a purchase of the LRI Note by Trendmaker" instead of Stewart. Relying upon Bank One's suggestion, Trendmaker ignored LRI's demands for payment.

Stewart's petition also asserted that Weyerhaeuser committed actual or constructive fraud because it knew and approved of Trendmaker's scheme to avoid liability on the Midland Note and loaned Trendmaker the funds to purchase the LRI Note. He

further claimed that Weyerhaeuser's liability was derivative of Trendmaker's tortious acts because Trendmaker is a wholly owned subsidiary of Weyerhaeuser. Among other allegations, Stewart claimed Trendmaker committed malicious and tortious interference in his business affairs.

Likewise, LRI asserted in its First Amended Cross–Action that Trendmaker and Weyerhaeuser committed actual and constructive fraud. The petition also alleged that Weyerhaeuser knowingly participated in, and agreed to, Trendmaker's sham, scheme, device and/or subterfuge to avoid Trendmaker's and Weyerhaeuser's obligations under the Midland Note and to prevent the enforcement of those obligations by advancing Trendmaker the funds to purchase the Midland Note.

Although the allegations are broad, both petitions raise a reasonable inference that Bank One and Weyerhaeuser participated in a conspiracy to defraud LRI by inducing Trendmaker to avoid liability on the Midland Note. Stewart's pleading also gives fair notice of his claim concerning Weyerhaeuser's derivative liability for Trendmaker's tortious conduct, including tortious interference with a business contact. We, therefore, overrule Weyerhaeuser's first and second points of error and Bank One's third point of error.

## III. Breach of the Bailment Agreement

In its first point of error, Bank One contends the trial court erred in submitting jury questions 1, 2, and 4 regarding breach of the Bailment Agreement and in granting judgment in favor of Stewart on that basis because the Bailment Agreement does not impose any of the duties Stewart alleged, and Bank One did not assume any of the duties Stewart alleged. Further, Bank One challenges the legal and factual sufficiency of the evidence to support the jury's findings that Bank One did not comply with the Bailment Agreement. Bank One also contends the Bailment Agreement is not enforceable because, as a matter of law, it does not satisfy the requirements of the *D'Oench, Duhme & Co. v. F.D.I.C.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Moreover, Bank One

claims the Bailment Agreement is not supported by consideration.

In its first point of error, Trendmaker asserts the trial court erred in submitting jury questions 1 through 9 concerning the Bailment Agreement and in granting judgment in favor of Stewart and LRI on that basis because (1) Trendmaker did not assume the Bailment Agreement as a matter of law; (2) the Bailment Agreement did not satisfy the requirements of the *D'Oench, Duhme* doctrine and its statutory counterparts; (3) Trendmaker was not charged with any of the duties alleged; and (4) the evidence was insufficient to support the submission of these questions to the jury or the jury's findings thereon. Similarly, Weyerhaeuser asserts in its twenty-seventh point of error that the trial court erred in entering judgment against Weyerhaeuser on the jury's findings to questions 3, 4, 6, and 8 that Trendmaker breached the Bailment Agreement. Weyerhaeuser adopts Trendmaker's arguments in support of its first point of error.

### A. Submission of Jury Question Regarding Breach of Bailment Agreement

■ An appellate court reviews allegations of error in the jury charge under an abuse of discretion standard. Tex.R.Civ.P. 277; *Howell Crude Oil Co. v. Donna Refinery*, 928 S.W.2d 100, 110 (Tex.App.—Houston [14th Dist.] 1996, writ denied.). The trial court has wide discretion in submitting jury questions as well as instructions and definitions. *Howell*, 928 S.W.2d at 110. "This discretion is subject to the requirement that the questions submitted must control the disposition of the case, be raised by the pleadings and evidence, and properly submit the disputed issues for the jury's deliberation." *Texas Dep't of Transp. v. Ramming*, 861 S.W.2d 460, 463 (Tex.App.—Houston [14th Dist.] 1993, writ denied).

■ Upon finding error in the charge, an appellate court reviews the pleadings, evidence, and the entire charge to determine if the error is harmful. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986); *Insurance Co. of N.A. v. Morris*, 928 S.W.2d 133, 143

(Tex.App.—Houston [14th Dist.] 1996, writ granted). Error in the jury charge is reversible if, viewed in the light of all the circumstances, it amounts to such denial of the rights of the complaining party as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Island Recreational,* 710 S.W.2d at 555; *Gilbert v. Pettiette,* 838 S.W.2d 890, 893 (Tex.App.—Houston [1st Dist.] 1992, no writ); Tex.R.App.P. 81(b)(1).

■■■■ Bank One and Trendmaker contend the trial court erred in submitting jury question 4 regarding their compliance with the Bailment Agreement because the interpretation of the terms of the Bailment Agreement and the existence of a breach are questions of law for the court and not issues of fact for the jury. The meaning given to the language in a contract is, of course, a question of law for the court. *Snyder v. Eanes Ind. Sch. Dist.,* 860 S.W.2d 692, 696 (Tex.App.—Austin 1993, writ denied). Likewise, whether a party has breached a contract is a question of law for the court and not a question of fact for the jury. *Meek v. Bishop Peterson & Sharp, P.C.,* 919 S.W.2d 805, 808 (Tex.App.—Houston [14th Dist.] 1996, writ denied). The court submits disputed fact questions to the jury only as far as a dispute exists concerning a party's failure to perform the contract. *Id.* Conversely, when the parties do not dispute the facts or conclusively establish facts regarding performance of the contract, the trial court need not submit those issues to the jury. *Id.*

Here, the parties did not dispute the existence of an express bailment contract or the actions of Bank One and Trendmaker. Instead, the parties disputed the terms of the Bailment Agreement and whether the actions of Bank One and Trendmaker constituted a breach of the Bailment Agreement. Both issues are questions of law. Thus, the trial court abused its discretion by submitting question 4 to the jury.

*B. Terms of the Bailment Agreement*

Stewart's Second Amended Original Petition reflects that many of Stewart's claims flow from Bank One's and Trendmaker's alleged breach of the express and implied terms of the Bailment Agreement. In fact, the first nine jury questions concern some aspect of the Bailment Agreement. Moreover, the jury found Bank One and Trendmaker breached express and implied duties in the Bailment Agreement. Therefore, to decide whether the submission of Question No. 4 amounted to such a denial of Bank One's and Trendmaker's rights to render an improper judgment, we review the evidence to determine the duties created by the Bailment Agreement and whether the evidence is sufficient to support the jury's findings that Bank One and Trendmaker did not comply with the agreement.

■■■■ Generally, bailment relationships are governed by common law principles of negligence. *See Anchor Cas. Co. v. Robertson Transport Co.,* 389 S.W.2d 135, 138 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.). Parties to a bailment relationship, however, may abrogate the law of bailment by making their own express contract that may "enlarge, abridge, qualify or supersede the obligations which otherwise would arise from the bailment by implication of law." *Id.* In such cases, the express agreement of the parties determines the rights and liabilities arising from a bailment. *Fowler v. One Seguin Art Center,* 617 S.W.2d 763, 765 (Tex.Civ.App.—Houston [14 Dist.] 1981, writ ref'd n.r.e.). Nevertheless, "while the bailee may enlarge or restrict his liability, he may not do so by words of doubtful meaning. The intent to vary the liability imposed by law must clearly appear." *Id.*

Stewart does not assert, nor do we find, that the language of the Bailment Agreement is ambiguous. MBank's letter [13] specifying

---

13. Stewart, MBank and LRI signed the Bailment Agreement, which provides as follows:

MBank Houston, National Association ("Senior Lienholder") acknowledges that pursuant to certain Collateral Transfer of Notes (Security Agreement) documents dated March 25, 1985, you as the "Secured Party" thereunder hold security interests which are subordinate and inferior to the rights and security interests created by that certain Collateral Assignment of Notes and Liens dated March 25, 1985, from TDT Development Company (now Leisure Resorts, Inc.), a Texas corporation ("Borrower"), to Ameriway Savings Associa-

the terms of the Bailment Agreement required Stewart to acknowledge, confirm, and agree that he held a subordinate and inferior lien in the Midland Note. Stewart further agreed that the provisions and agreements [14] set forth in the first two paragraphs of the letter, which acknowledged the security agreements between LRI and Stewart,[15] and between LRI and Ameriway,[16] and his inferior interest in the Midland Note, were binding upon him, his heirs and assigns, and inured to the benefit of MBank. The security agreement between Stewart and LRI gave Stewart a junior security interest in the Midland Note and permitted him to collect on the Midland Note. The security agreement between LRI and Ameriway, however, gave Ameriway [17] the senior security interest in the Midland Note and all the rights of a secured party under the Uniform Commercial Code, as well as all "other rights, powers, and remedies of the holder and owner of the

tion, filed for record on March 29, 1985, in the Real Property Records of Galveston County, Texas, under Clerk's File No. 8512201, and recorded under Film Code Reference No. 003–73–1929, said Collateral Assignment of Notes and Liens being subsequently transferred and assigned to Senior Lienholder. Said Collateral Assignment of Notes and Liens covers and relates to that certain promissory note dated March 25, 1985 (the "Note"), executed by Midlands Associates, a Texas joint venture composed of Trendmaker, Inc., a Texas corporation, and Commonwealth Realty Development, Inc., a Texas corporation, payable to the order of TDT Development company (now Leisure Resorts, Inc.), a Texas corporation, in the original principal amount of NINE MILLION THIRTY–ONE THOUSAND TWO HUNDRED FOURTEEN AND NO/100 DOLLARS ($9,031,-214.00), which promissory note is secured by a vendor's lien retained in a deed to Midlands Associates and a deed of trust and security agreement of even date therewith from Midlands Associates, to R. Charles Stiles, Trustee, recorded in the Real Property Records of Galveston County, Texas, under Clerk's File No. 8512200, covering four (4) tracts of land out of the Perry and Austin Upper League, Abstract 19, Galveston County, Texas.

By your acceptance as indicated by your signature in the space provided below, you confirm and agree that all indebtedness owing and to become owing to you by TDT Development Company (now Leisure Resorts, Inc.), as stated in that one certain Promissory Note dated March 25, 1985, in the original principal sum of ONE MILLION FOUR HUNDRED FIFTY THOUSAND AND NO/100 ($1,450,-000.00) DOLLARS, the payment thereof, and all liens and security interests securing said indebtedness and all renewals, extensions and rearrangements thereof, are and shall remain subordinate and inferior to the indebtedness owing and to become owing to Senior Lienholder by TDT Development Company (now Leisure Resorts, Inc.), the payment thereof, and all liens and security interests securing said indebtedness and all renewals, extensions and rearrangements thereof.

The provisions and agreements set forth in the foregoing two (2) paragraphs shall be binding upon you, your heirs and assigns, and shall inure to the benefit of Senior Lienholder, its successors and assigns.

Subject to the foregoing, Senior Lienholder agrees to act as Bailee for you with respect to the Note solely for the purpose of perfecting your subordinate and inferior security interest in the Note, and in addition to acting on its own behalf, and should all indebtedness secured by its first and superior security interest in the Note be fully and finally paid, and you continue to hold your subordinate and inferior security interest in the Note, Senior Lienholder shall deliver the Note to you, provided, Senior Lienholder shall not be liable to you or any other person if it fails to so deliver the Note to you because of oversight or simple negligence.

This agreement supercedes any and all prior agreements creating any bailments, including, without limitation, the letter dated March 25, 1985, addressed to you from Ameriway Savings Association, and Ameriway Savings Association is hereby released from any and all liabilities and obligations whatsoever arising out of or in connection with any and all such agreements.

This letter shall not be effective to bind any party hereto until all parties hereto have executed this letter and delivered to the Senior Lienholder a fully executed copy hereof.

**14.** The law is well-established where instruments pertain to the same transaction, they should be read together even though the instruments were executed at different times and do not expressly refer to each other. *GTE Directories Corp. v. McKinnon*, 734 S.W.2d 429, 431 (Tex.App.—Fort Worth 1987, no writ).

**15.** The security agreement between TDT Development Company, later restructured as LRI, and Stewart was entitled the Collateral Transfer of Note (Security Agreement).

**16.** The security agreement between TDT Development Company and Ameriway was entitled the Collateral Assignment of Notes and Liens.

**17.** LRI assumed TDT Development Company's obligations to Ameriway, and Ameriway assigned its interests in the LRI note and the Midlands note to MBank whose assets Bank One eventually acquired.

Collateral Note and the liens and securities existing in connection therewith and securing the payment thereof." Stewart also agreed, subject to the foregoing, that MBank held the Midlands Note *solely* for the purpose of perfecting his junior interest in the note, and that besides acting in its own behalf, MBank would return the Midland Note if the LRI Note was paid in full.

■ Despite the unambiguous language, Stewart contends the Bailment Agreement imposed extraordinary duties that Bank One breached by assigning the Midland Note to Trendmaker. Stewart first contends Bank One breached the Bailment Agreement by ceasing to act as his bailee because the express language of the Bailment Agreement does not state under what conditions the bank may cease to act as the bailee of the Midland Note. Stewart, however, never pled that Bank One breached the Bailment Agreement by ceasing to act as his bailee or raised this argument in the court below. Therefore, we decline to address this issue on appeal. *See* Tex.R.App.P. 74(f).

■ Next, Stewart contends Bank One held the Midland Note under the Bailment Agreement as his agent, representative, and fiduciary because he subordinated his security interest in the Midland Note in consideration for the bank taking physical possession of the note. Because Bank One possessed the Midland Note, Stewart claims he could only collect the note with Bank One's cooperation. Therefore, he maintains Bank One, and later Trendmaker, had a duty to collect the note for his benefit rather than foreclosing on its senior lien or transferring the Midland Note when it sold the LRI Note to Trendmaker. Stewart asserts Bank One did not cooperate in, and in fact, hindered his efforts to collect the Midland Note because Bank One never made a serious attempt to collect the Midland Note, refused to permit LRI to sue to collect the Midland Note, offered to sell the Midland Note to Trendmaker during the sixty-day moratorium with LRI, and refused to join or cooperate with

Stewart's suit against Trendmaker and Weyerhaeuser.

■ A duty to cooperate is implied in every contract in which cooperation is necessary for performance of a contract. *See Citizens Nat'l Bank of Orlando v. Vitt*, 367 F.2d 541, 545 (5th Cir.1966); *see also Keener v. Sizzler Family Steak Houses*, 424 F.Supp. 482, 484 (N.D.Tex.1977), *aff'd. in part*, 597 F.2d 453, 458 (5th Cir.1979). Stewart, however, cites no Texas authority, and we have found no authority, to support an implied duty of cooperation in a bailment agreement. Moreover, Texas law does not favor implied covenants. *Nalle v. Taco Bell Corp.*, 914 S.W.2d 685, 687 (Tex.App.—Austin 1996 writ denied). Generally, the court looks beyond the written agreement to imply a covenant only if necessary to effectuate the intention of the parties as disclosed by the contract as a whole, but not to make the contract fair, wise, or just. *Id.* An implied covenant is necessary to effectuate the parties' intentions only if the obligation is "so clearly within the contemplation of the parties that they deemed it unnecessary to express it." *Id.* (citing *Danciger Oil & Ref. Co. v. Powell*, 137 Tex. 484, 154 S.W.2d 632, 635 (Tex.1941)).

In this case, the Bailment Agreement does not mention the bank's duty to collect money on Stewart's behalf, cooperate with Stewart in collecting payment on the Midland Note, or forebear from foreclosing or assigning the note. Stewart argues a reasonable loan officer would read the Bailment Agreement, along with LRI's letter directing the bank to disburse funds remaining after payment of the LRI Note to Stewart, and conclude the bank had the duty to collect the Midland Note on his behalf. Nevertheless, the Collection Letter directing MBank to disburse proceeds was executed several months after the Bailment Agreement and merely authorized the bank, upon the receipt of payment, to disburse excess proceeds to junior lienholders.[18]

■ "There can be no implied covenant as to a matter specifically covered by the

---

18. Unlike other documents expressly named and acknowledged, the Bailment Agreement makes

no mention of the Collection Letter.

written terms of the contract." *Texstar N. A., Inc. v. Ladd Petroleum Corp.*, 809 S.W.2d 672, 678 (Tex.App.—Corpus Christi, writ denied). Here, the Bailment Agreement expressly states the sole purpose of the bailment is to perfect Stewart's subordinate and inferior security interest in the Midlands Note. The term "perfection" describes a security interest in personal property that cannot be defeated in insolvency proceedings or in general by creditors. TEX.BUS. & COM. CODE ANN. § 9.301 cmt. 1 (Vernon 1991). A creditor perfects a security interest in an instrument when he or his agent takes possession of the instrument. *Id.* § 9.305. By possessing the instrument, the creditor or his agent provides notice that the instrument is encumbered. *Bray v. Cadle Co.*, 880 S.W.2d 813, 817 (Tex.App.—Houston [14th Dist.] 1994, writ denied).

A secured party takes priority over an unperfected security interest and may take priority over other secured parties depending upon when the parties perfected their interest. TEX.BUS. & COM.CODE ANN. §§ 9.301 & 9.312 (Vernon 1991 & Supp.1997). Upon a debtor's default, a creditor with a perfected security interest has statutory rights and remedies with respect to collateral, as well as rights and remedies provided in the security agreement. *Id.* § 9.501(a). Here, the bank's possession of the Midland Note provided no protection by law or by agreement to Stewart's junior interest in the note, other than to provide notice that the note was encumbered and to give him priority over other junior lienholders or unperfected parties. Because the parties specifically contracted the extent of their bailment relationship, we decline to imply additional duties.

■ Even if a duty to cooperate could be implied, case law makes it clear that an implied duty to cooperate requires that a promisee may not hinder, prevent, or interfere with the promisor's ability to perform his duties under an agreement. *Bagwell Coatings, Inc. v. Middle South Energy, Inc.*, 797 F.2d 1298, 1305 n. 6 (5th Cir.1986). Here, Bank One did not hinder or interfere with Stewart's ability to perform under the Bailment Agreement because the Bailment Agreement did not require Bank One to col-

lect, or to assist Stewart in collecting the Midland Note.

■ In the alternative, Stewart claims that both the express and implied terms of the Bailment Agreement required Bank One, and later Trendmaker, to deliver the Midland Note to him when Bank One's interest in the note was satisfied. As to the express provision in the Bailment Agreement that the bank would deliver the Midland Note to Stewart if the LRI Note was fully paid, Stewart claims Bank One waived full payment because, on an internal document entitled the "Notification of Settled Credit," it forgave $449,200 in principal owed on the LRI obligation. The Notification of Settled Credit stated that "[t]he sale resulted in principal forgiveness of $449,200. This sum will not be pursued as this transaction was conducted as a third party sale."

Stewart argues that Bank One's waiver of full payment of the LRI Note and its acceptance of $2,750,000 as partial satisfaction of the LRI Note triggered its obligation as bailee to deliver the Midland Note to Stewart. Furthermore, Stewart maintains Bank One did not object to the definition of waiver submitted with question 4, and therefore waives any objection on appeal.

Notwithstanding the term "principal forgiveness," neither the Notification of Settled Credit nor the parties' conduct indicate Bank One voluntarily intended to discharge LRI's obligation, in whole or in part. A person entitled to enforce an instrument may discharge the obligation of the party to pay the instrument by an intentional voluntary act such as (1) surrender of the instrument to the party; (2) destruction, mutilation, or cancellation of the instrument; (3) cancellation or striking out of the party's signature; (4) the addition of words to the instrument indicating discharge; or (5) by agreeing not to sue or otherwise renouncing rights against the party by a signed writing. TEX.BUS. & COM.CODE ANN. § 3.604 (Vernon Supp.1997). The record reflects Bank One did not discharge LRI's obligation by any of these means.

The Notification of Settled Credit was an internal document within Bank One's files,

the terms of which were never communicated to LRI, Stewart, or Trendmaker. Although initialed by a Bonnet loan manager, neither a Bank One nor a Bonnet representative signed the document. Moreover, a plain reading of the document reveals the term "principal forgiveness" refers to the net loss of principal owed on the LRI Note as noted in the columns entitled "Principal Legal Amount" and "Principal Amount Forgiven." Although the phrase "principal forgiveness" suggests forgiveness of the debt, the narrative entitled "Summary of Settlement" makes it clear Bank One declined to pursue its net loss because it sold the note to Trendmaker. By selling its interest in the note, Bank One transferred its right to enforce the note to Trendmaker. "Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course." *Id.* § 3.203(b).

The conduct of the parties further supports Bank One's position that it did not forgive or accept a partial satisfaction of the debt. The record reflects, and the parties do not dispute, that neither Stewart, LRI, nor anyone else paid the note in full. The record further reflects Trendmaker, as transferee, demanded payment from LRI and then foreclosed on the Midland Note. LRI's and Stewart's representatives attended the foreclosure sale. Although Stewart complained of the unreasonableness of the foreclosure sale, neither Stewart nor LRI asserted that Bank One had forgiven the LRI debt at the time of the LRI sale or the Midland foreclosure. Consequently, throughout the transaction, Stewart remained a subordinate secured party with no right to possession of the Midland Note. *See Mark Products U.S. v. Interfirst Bank Houston, N.A.,* 737 S.W.2d 389, 396 (Tex.App.—Houston [14th Dist.] 1987, writ denied). Neither the Notification of Settled Credit nor the parties' conduct, indicate that Bank One voluntarily excused the debt and discharged LRI's indebtedness. Therefore, because the LRI Note was not paid in full, Bank One had no obligation under the terms of the Bailment Agreement to deliver the Midland Note to Stewart.

The trial court should have decided question 4 in favor of Bank One and Trendmaker as a matter of law because the Bailment Agreement did not impose express or implied duties on Bank One or Trendmaker to protect Stewart's interest in the Midland Note. Therefore, the trial court committed reversible error by submitting question 4 to the jury.

Trendmaker further contends the trial court erred in submitting jury questions 5, 6, and 8, which were conditioned upon a favorable finding to question 4. Jury questions 5 and 6 asked whether the failure of Bank One and Trendmaker, respectively, to comply with the Bailment Agreement was a proximate cause of damages to Stewart. Jury question 8 asked if Trendmaker's failure to comply with the Bailment Agreement was excused. A jury question is immaterial when it should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *Spencer v. Eagle Star Ins. Co. of America,* 876 S.W.2d 154, 157 (Tex.1994). Because we find the trial court committed reversible error by submitting question 4 to the jury, the jury's answers to questions 5, 6, and 8 are immaterial. Moreover, we need not address Bank One's and Trendmaker's evidentiary challenge regarding a breach of the Bailment Agreement.

### C. *D'Oench, Duhme*

Bank One and Trendmaker further contend the trial court erred in submitting jury questions 1, 2, and 3 because the Bailment Agreement does not satisfy the requirements of *D'Oench, Duhme* and its statutory counterparts and, therefore, is unenforceable. Question 1 asked whether the Bailment Agreement satisfied the requirements of *D'Oench, Duhme & Co. v. F.D.I.C.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and Sections 1821(n)(4)(I) and 1823(e) of 12 U.S.C. Questions 2 and 3 asked if Bank One and Trendmaker, respectively, agreed to assume MBank's obligations under the Bailment Agreement.

*D'Oench, Duhme* and its statutory counterparts prohibit the enforcement of any agreement that tends to defeat or dimin-

ish the rights of a bridge bank in an asset acquired by the bridge bank from the receiver for a failed bank, unless the agreement (1) is in writing; (2) was executed by the failed bank, contemporaneously with the acquisition of the asset; (3) was approved by the board of directors or loan committee of the failed bank and the approval is reflected in the minutes of the board or committee; and (4) the agreement has been continuously, from its execution, an official record of the failed bank. *Bell & Murphy & Assoc. v. Interfirst Bank Gateway, N.A.,* 894 F.2d 750, 754–55 (5th Cir.), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); 12 U.S.C.A. § 1821(n)(4)(I) (West 1989); *see also* 12 U.S.C.A. § 1823(e) (West Supp.1996) (enumerating same requirements for a financial institution in a corporate capacity). To satisfy *D'Oench, Duhme,* the record must reflect "more than a writing indicating that there is some type of agreement. The specific term a party seeks to enforce against the receiver must be in writing in the bank's file." *Bluebonnet Sav. Bank v. Jones Country, Inc.,* 920 S.W.2d 670, 671 (Tex.1996).

In this instance, whether enforcement of the Bailment Agreement violates *D'Oench, Duhme* is immaterial because, as discussed *supra,* the Bailment Agreement did not defeat or diminish the rights of Bank One or Trendmaker as to their respective interest in the Midland Note. Even if *D'Oench, Duhme* were applicable, there is no evidence that MBank's loan committee approved the specific terms of the agreement. The record reflects that members of MBank's executive loan committee inscribed their initials on LRI's loan application to indicate their approval of the LRI loan. Attached to the loan application was an internal memorandum from a loan officer recommending, among other things, that MBank require an estoppel and subordination agreement from Stewart consenting "to the renewal and continued subordination of the $1,450 M debt." Assuming the notations on the loan application constitute "minutes" of the loan committee, the minutes do not reflect the loan committee's approval of the specific terms of the Bailment Agreement.

Viewing the jury charge in light of the totality of circumstances, we find the submission of jury question 4 amounted to a denial of Bank One's and Trendmaker's rights and caused the rendition of an improper judgment. The trial court further abused its discretion in submitting jury questions 1, 2, 3, 5, 6 and 8 because these questions were rendered immaterial by this court's finding to jury question 4. Therefore, we sustain Bank One's and Trendmaker's first points of error and Weyerhaeuser's twenty-seventh point of error.

## IV. Duty of Reasonable Care of Collateral in Secured Party's Possession

In its fourth point of error, Bank One contends the trial court erred in submitting jury question 18(A), which inquired whether Bank One failed to use reasonable care to preserve the rights on the Midland Note while it was in Bank One's custody, and in granting judgment on the jury's finding. Section 9.207(a) of the business and commerce code provides that "[a] secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed." TEX.BUS. & COM. CODE ANN. § 9.207(a) (Vernon 1991). Bank One contends it owed no duty to Stewart under Section 9.207(a) because LRI had "otherwise agreed" that MBank would not be liable for any neglect or failure to take action with reference to the Midland Note and because Section 9.207 applies only to parties to the transaction, namely, the debtor and the secured party. Bank One also challenges the legal and factual sufficiency of the evidence to support the jury's finding that Bank One failed to exercise reasonable care to preserve Stewart's rights against Trendmaker under the Midland Note.

To address Bank One's contentions, we must first construe the language of Section 9.207. An appellate court construes a statute to give effect to its legislative intent. *City of Wilmer v. Laidlaw Waste Systems (Dallas), Inc.,* 890 S.W.2d 459, 465 (Tex.

App.—Dallas 1994), *aff'd,* 904 S.W.2d 656 (Tex.1995). Moreover, an appellate court construes a uniform act included in a code to give effect to its general purpose to make uniform the law of those states that enact it. TEX. GOV'T CODE ANN. § 311.028 (Vernon 1988).

An appellate court first reviews the language of the statute. *City of Wilmer,* 890 S.W.2d at 465. If the language of the statute is ambiguous, the appellate court consults statutory construction rules and related legislative history. *Id.* The appellate court reviews an act as a whole. *Id.* It does not give a statute meaning that conflicts with other provisions if it can reasonably harmonize the provisions. *Id.* Moreover, the appellate court gives full effect to the statute's language, not just to one word or phrase. *Id.* When the legislature does not expressly define statutory terms, the court gives the words ordinary meaning. *Id.* If the statute refers to a person, thing, or consequence, it excludes all others. *Id.* Finally, the appellate court does not construe a statute in a manner that will lead to a foolish or absurd result if another alternative is available. *Id.; see* TEX. GOV'T CODE ANN. §§ 311.001–.032, 312.001–.013 (Vernon 1988 & Supp.1997).

Section 9.207 is not ambiguous, and it does not permit the parties to a security agreement to "otherwise agree" to waive the negligent handling and loss of collateral in the secured party's possession. By utilizing the word "must," the legislature intended that there be a mandatory duty to use reasonable care. The statute does, however, authorize the parties to agree as to what constitutes reasonable care. This construction is consistent with the legislative intent [19] as noted by Comment 1 of Section 9.207.[20] Here, the parties disclaimed the duty of reasonable care by providing that the bank "shall not be liable for any neglect or failure to take action with reference to the [Midland] Note." We find such waiver to be contrary to Section 9.207(a).

Nevertheless, Stewart's claim fails because Stewart was not a debtor as to the bank. Section 9.207 provides a right of action to debtors only with respect to the specific debt secured. *Walther v. Bank of New York,* 772 F.Supp. 754, 765–66 (S.D.N.Y. 1991). Section 9.207(c) provides that "[a] secured party is liable for any loss caused by his failure to meet any obligation imposed by the preceding subsections but does not lose his security interest." TEX.BUS. & COM.CODE ANN. § 9.207(d) (Vernon 1991). Section 9.207 falls within Subchapter B of Article 9 of the Uniform Commercial Code entitled "Validity of Security Agreement and Rights of Parties Thereto." *Id.* § 1.109 cmt. 1 (stating that the section captions are part of the text and not mere surplusage). Although not defined by Article 9, the business and commerce code defines a party as a "person who has engaged in a transaction or made an agreement within this title." *Id.* § 1.201(29). "The parties to the security agreement are the 'debtor' and the 'secured party.'" *Id.* § 9.105 cmt. 2. A debtor is "the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral." *Id.* § 9.105(a)(4). A secured party is the "lender, seller, or other person in whose favor there is a security interest." *Id.* § 9.105(a)(13).

Although the legislature's definition of a secured party does not directly address who may sue a secured party under Section 9.207(c), subsection (b) of the statute identifies some of the risks and responsibilities attributable to the secured party and to the

---

**19.** Among the stated purposes of enacting the Uniform Commerce in Texas are these goals: (1) to simplify, clarify and modernize laws governing commercial transactions; (2) to expand commercial practices through custom, usage and agreement of the parties; and (3) to make uniform the law among various jurisdictions. TEX.BUS. & COM. CODE ANN. § 1.102 (Vernon 1994).

**20.** The Uniform Commercial Code comment states:

Under Section 1–102(3) the duty to exercise reasonable care may not be disclaimed by agreement, although under that Section the parties remain free to determine by agreement, in any manner not manifestly unreasonable, what shall constitute reasonable care in a particular case.

TEX.BUS. & COM.CODE ANN. § 2.07, cmt. 1.

debtor while the collateral is in the possession of the secured party. *Id.* § 9.207(b). For example, Subsection (b)(1) provides that reasonable expenses incurred in the "custody, preservation, use or operation of the collateral are chargeable to the debtor and secured by the collateral," while Subsection (b)(2) places the "risk of accidental loss or damage" on the debtor to the extent of deficient insurance coverage. *Id.* § 9.207(b)(1) & (2). On the other hand, Subsection (b)(5) provides that "the secured party may repledge the collateral upon terms which do not impair the debtor's rights to redeem it." *Id.* § 9.207(b)(5). Such references to debtors strongly suggest that only debtors have a cause of action under Section 9.207(c). *Walther*, 772 F.Supp. at 766.

Stewart argues that a third party who holds a subordinate secured interest in the collateral possessed by the senior secured party may also bring suit against the secured party because Section 9.207 applies to collateral possessed by the secured party after default. Therefore, he asserts, a debtor or any person entitled to notice or whose security interest was known to the secured party may recover from the secured party any loss caused by the secured party's failure to comply with default procedures under Subchapter E Default. *See* TEX.BUS. & COM.CODE ANN. § 9.507(a) (Vernon 1991).

Section 9.207 applies not only when the secured party has possession of the collateral before default, as a pledgee, but also when he has taken possession of the collateral after default. *Id.* §§ 9.207 cmt. 4, 9.501 cmt. 3. Because a default changes the relationship of the parties, Section 9.207 as it applies after default must be read together with Subchapter E Default. *Id.* § 9.501 cmt. 3. Section 9.501, however, does not extend the rights, remedies and duties of a secured party or a debtor to third party lienholders before disposition of the collateral. Instead, Section 9.501 expressly limits the rights, remedies and duties of Section 9.207 to the secured party and the debtor. Section 9.501(a) provides after the debtor is in default, a secured

party has the rights and remedies provided in Subchapter E except as limited by those provided in the security agreement and the rights, remedies and duties provided in Section 9.207. *Id.* § 9.501(a). Likewise, after default the debtor has the rights and remedies provided in Subchapter E, those provided in the security agreement, and those provided in Section 9.207. *Id.* Although the parties may by agreement determine the standards by which their rights and duties are measured under certain provisions of Subchapter E, they may not waive or vary specific subsections of Subchapter E, including Subsection 9.507(a), to the extent it gives rights to the debtor and imposes duties on the secured party. *Id.* § 9.501(c).

Although Section 9.207 provides for the rights, remedies, and duties assigned to a secured party and a debtor while the secured party is in possession of the collateral before and after default, Subsection 9.507(a) permits a debtor or any person to recover for any loss related to the secured party's failure to comply with the default procedures of Subchapter E after the secured party has disposed of the collateral. *Id.* § 9.507(a). Bank One, however, did not dispose of the collateral. A disposition occurs when the secured party sells, leases, or otherwise disposes of any or all of the collateral. *Id.* § 9.504(a).[21] In this case, Bank One sold the LRI Note and assigned its collateral, the Midland Note to Trendmaker. The assignment of rights in the collateral supporting a loan pursuant to a sale of the loan is not a disposition of collateral under Section 9.504. *Hairgrove v. Cramer Financial Group, Inc.*, 895 S.W.2d 874 (Tex.App.—Fort Worth 1995, writ denied). Because no disposition of collateral occurred, we decline to address the merits of Stewart's argument that a third party secured creditor may sue the secured creditor after disposition of the collateral for its failure to preserve the collateral while in the secured party's possession.

Because Section 9.207(c) provides a cause of action to debtors only, Stewart, as a third party holding a subordinate secured interest

---

**21.** A secured party may dispose of collateral by destroying it. *First City Bank–Farmers Branch v.*

*Guex*, 677 S.W.2d 25, 28 (Tex.1984).

in the Midland Note, has no cause of action against Bank One for its alleged failure to use reasonable care while in possession of the Midland Note. The trial court abused its discretion, therefore, in submitting question 18(A) to the jury and in granting judgment on the jury's finding. Moreover, because the trial court granted judgment on the jury's finding, we find the action to be reversible error. We sustain Bank One's fourth point of error.

## V. Tort Claims

In its third point of error, Trendmaker contends the trial court erred in submitting jury questions 9 through 22B and in entering judgment on those questions because Stewart's and LRI's claims sound in contract and not in tort. "A party to a contract is free to pursue its own interests, even if it results in a breach of that contract, without incurring tort liability." *Stewart Title Guaranty Co. v. Aiello*, 941 S.W.2d 68, 71 (Tex.1997) (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex.1992)). Nevertheless, "[t]he acts of a party may breach duties in tort or contract alone or simultaneously in both." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986). If the only loss or damage is the economic loss to the subject matter of the contract, the plaintiff's action is ordinarily in contract. *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). When the obligation is one imposed by law rather than by promises of the parties, the action is ordinarily in tort. *Id.* A plaintiff may assert both tort and contract claims if the defendant's conduct would give rise to liability independent of the existence of a contract. *Id.*

The jury found that Bank One and Trendmaker breached the duty of good faith and fair dealing, and Bank One, Trendmaker, and Weyerhaeuser committed fraud and conspiracy to commit fraud. The jury also found Trendmaker converted the Midland Note, and tortiously interfered in Stewart's and LRI's business relationships with Bank One. Bank One, Trendmaker, and Weyerhaeuser, however, contend the evidence is legally and factually insufficient to support the jury's findings of tortious conduct and the trial court's judgment based on those findings. Consequently, in each point of error related to the jury's findings of tortious conduct, Bank One, Trendmaker, and Weyerhaeuser raise sufficiency challenges to the jury's findings and trial court's judgment.

When both legal and factual sufficiency points are raised on appeal, the appellate court first addresses the "no evidence" or legal sufficiency point to decide if there is any evidence of probative value to support the trial court's findings. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981). In deciding a no evidence claim, an appellate court considers the evidence and inferences tending to support the jury's findings, and disregards all contrary evidence and inferences. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992). The appellate court will uphold the jury's verdict if there is any evidence of probative force supporting the jury's findings. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex.1997); *Holt Atherton Indust., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992) (if there is more than a scintilla of evidence to support the finding, the point must be overruled and the finding upheld). There is more than a scintilla when the evidence creates more than a mere surmise or suspicion of its existence. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). Using these guidelines, we examine the conduct of Bank One, Trendmaker, and Weyerhaeuser concerning Stewart's and LRI's tort claims.

### A. Good Faith and Fair Dealing

In its second point of error, Bank One asserts error in the submission of questions 9 and 15(A), and the entry of judgment based on the jury's findings to these questions. Bank One contends that, as a matter of law, the Bailment Agreement did not create a special relationship between Bank One and Stewart giving rise to a duty of good faith and fair dealing. In its fourth point of error, Trendmaker maintains the trial court erred in entering judgment based on jury findings to questions 15(A) through 18, related to Trendmaker's alleged breach of the duty of good faith and fair dealing. It argues no

special relationship existed between Trendmaker and Stewart or LRI, and the jury was improperly instructed on this issue. Both Bank One and Trendmaker challenge the sufficiency of the evidence to support the jury's liability findings on the breach of the duty of good faith and fair dealing.

■ In response to question 15(A), the jury found Bank One and Trendmaker failed to act with good faith and fair dealing toward Stewart. The trial court defined good faith and fair dealing as "honesty in fact in the conduct or transaction concerned." *See* TEX. BUS. & COM.CODE ANN. § 1.201(19) (Vernon 1994). Every contract or duty governed by the business and commerce code imposes an obligation of good faith in its performance or enforcement. *Id.* § 1.203. The failure to act in good faith under Section 1.203, however, does not state an independent tort action. *Hallmark v. Hand,* 885 S.W.2d 471, 480 (Tex. App.—El Paso 1994, writ denied). "A breach of this implied duty under the code gives rise only to a cause of action for breach of contract." *Id.*

Here, neither Bank One nor Trendmaker were parties with Stewart to any contract that would give rise to the duty of good faith and fair dealing. Even if the Bailment Agreement fell within the parameters of the business and commerce code, neither Bank One nor Trendmaker breached the agreement or acted in bad faith in implementing the agreement. The trial court abused its discretion in submitting question 15(A) because, as a matter of law, neither Bank One nor Trendmaker owed Stewart the duty of good faith and fair dealing under the Texas Business and Commerce Code.

In response to question 17, the jury found Trendmaker failed to act in good faith and fair dealing toward LRI. Here, the trial court defined good faith and fair dealing according to the standard of a fiduciary, as "that degree of care and diligence which a person of ordinary care and prudence would exercise in the management in his own business." *See Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987). In response to question 9, the jury found the

Bailment Agreement created a special relationship between Stewart and Bank One giving rise to the duty of good faith and fair dealing. The trial court instructed the jury that good faith and fair dealing "arises as a result of a special relationship between the parties governed or created by a contract. This duty arises from the nature of the parties' relationship rather than from purely legal obligations arising from the contract."

■ A claim for breach of the duty of good faith and fair dealing is a tort action that arises from an underlying contract. *Cole v. Hall,* 864 S.W.2d 563, 568 (Tex.App.—Dallas 1993, writ dism'd w.o.j.). Texas law, however, does not recognize an implied duty of good faith and fair dealing in every contract or business transaction. *English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983). "The nature of the relationship between the parties, not merely the existence of the contract alone, is the essential factor in determining whether such a duty exists." *Aiello,* 941 S.W.2d at 71.

■ Texas courts recognize at least two types of special relationships in contract, a fiduciary relationship arising from an element of trust necessary to accomplish the goals of the contract and a special relationship based on extracontractual duties arising from an imbalance of bargaining power. *Farah v. Mafrige & Kormanik, P.C.,* 927 S.W.2d 663, 675 (Tex.App.—Houston [1st Dist.] 1996, no writ).[22] There are two types of fiduciary relationships—a formal fiduciary relationship such as that of an agent and principal that arise as a matter of law and an informal or confidential relationship that arise "where one person trusts in and relies upon another, whether the relation is moral, social, domestic or merely personal." *Crim Truck,* 823 S.W.2d at 594; *Hallmark v. Port/Cooper,* 907 S.W.2d 586, 592 (Tex. App.—Corpus Christi 1995, no writ). A confidential relationship exists where influence has been acquired and abused, and confidence has been reposed and betrayed. *Crim Truck,* 823 S.W.2d at 594 (citing *Texas Bank & Trust Co. v. Moore,* 595 S.W.2d 502,

22. *See also* Fred A. Simpson and Deborah J. Selden, *Special Relationships Under Texas Tort and Contract Law,* Houston Lawyer (forthcoming,1997) (manuscript on file with author).

507 (Tex.1980)). The second type of special relationship, an extracontractual special relationship, exists where there is an unequal bargaining position between parties to a contract. *See Arnold,* 725 S.W.2d at 167 (Tex. 1987). Absent an "Arnold" special relationship, the duty to act in good faith is contractual in nature and its breach does not amount to an independent tort. *Central Sav. & Loan Ass'n v. Stemmons N.W. Bank, N.A.,* 848 S.W.2d 232, 239 (Tex.App.—Dallas 1992, no writ).

While both fiduciary and extracontractual special relationships establish a duty of good faith and fair dealing from which tort damages result, the two duties have a different standard of care.[23] A fiduciary duty requires the fiduciary to place the interest of the other party before his own, if necessary, whereas the common law duty of good faith and fair dealing merely requires the parties to deal fairly with one another. *Crim Truck,* 823 S.W.2d at 594. Whether a duty exists between the parties is initially a question of law. *H.W. Mitchell v. Missouri–Kansas–Texas R.R.,* 786 S.W.2d 659, 661 (Tex.), *cert. denied,* 498 U.S. 896, 111 S.Ct. 247, 112 L.Ed.2d 205 (1990). Whether a confidential relationship exists is usually a question of fact. *Crim Truck,* 823 S.W.2d at 595. When the existence of a confidential relationship is challenged on the basis of no evidence, it becomes a question of law. *Id.*

Here, there is no probative evidence that a fiduciary relationship existed between LRI and Trendmaker giving rise to a fiduciary duty of good faith. A special relationship does not usually exist between a borrower and lender, and when Texas courts have found one, the findings have rested on extraneous facts and conduct, such as excessive lender control or influence in the borrower's business activities. *Farah,* 927 S.W.2d at 675. *See also Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962) (debtor-creditor relationship did not create fiduciary relationship). Moreover, subjective trust is not enough to transform an arms-length transaction between debtor and creditor into a fiduciary relationship. *Greater Southwest Office*

*Park, Ltd. v. Texas Commerce Bank Nat'l Ass'n,* 786 S.W.2d 386, 391 (Tex.App.—Houston [1st Dist.] 1990, writ denied).

The initial relationship between LRI and Trendmaker was that of lender to borrower on the Midland Note. As LRI's debtor, Trendmaker owed no fiduciary duty to its creditor LRI. The relationship between LRI and Trendmaker changed when Trendmaker purchased the LRI Note from Bank One. At that time, Trendmaker became LRI's creditor on the LRI Note, while Trendmaker remained LRI's debtor on the Midland Note. Despite this awkward business relationship, there is no evidence that Trendmaker exerted excessive control or influence over LRI's business activities that would give rise to a fiduciary duty.

LRI, however, contends that Trendmaker owed it a duty of good faith under Section 1.203 of the business and commerce code with regard to Trendmaker's performance on the Midland Note and in its subsequent purchase of the note at the foreclosure sale. As we have already stated, the failure to act in good faith under Section 1.203 does not state an independent tort action, but a cause of action for breach of contract. *Hand,* 885 S.W.2d at 480. In question 17, the trial court asked the jury to find a breach of duty based on an independent tort, not the breach of a duty based on a contract. Because Trendmaker did not have a formal or informal fiduciary relationship with LRI, it did not owe LRI a fiduciary duty of good faith and fair dealing as defined in jury question 17. The trial court abused its discretion in submitting question 17 to the jury and in entering judgment against LRI on the jury's finding.

The trial court also abused its discretion in submitting question 9 and entering judgment on the jury's findings. The Bailment Agreement did not create a formal or an informal fiduciary relationship, nor was the agreement based on an extracontractual special relationship between Stewart and Bank One. A bailment relationship generally does not create a formal fiduciary relationship. *See Andrews v. Allen,* 724 S.W.2d 893,

---

23. Simpson, *supra.*

898 (Tex.App.—Austin 1987, no writ) (rejecting an agency relationship); *see also Cox v. Thee Evergreen Church,* 836 S.W.2d 167, 177 (Tex.1992). Although Stewart likens a bailment relationship to that of an escrow agent to a buyer and seller, the Bailment Agreement, in this instance, created no fiduciary relationship between the bank and Stewart. Stewart cites no Texas authority, and we have none, to support the existence of a fiduciary relationship, absent an express agreement, between bailee and bailor.

In addition, there is no evidence of an informal confidential relationship between Bank One and Stewart based on trust and reliance related to the Bailment Agreement. Both Bank One and Stewart were creditors of LRI and shared a security interest in the same collateral, namely, the Midland Note. Bank One held the senior interest in the Midland Note. Following the practice of MBank, Bank One distributed excess payments on the LRI Note to Stewart. Beyond several conversations and letters regarding the purchase of the LRI Note and litigation on the Midland Note, Bank One and Stewart engaged in no other dealings.

Finally, there is no evidence that Stewart and MBank, as predecessor to Bank One, had a special relationship based on unequal bargaining position relative to the Bailment Agreement. Stewart is a successful, well-educated, and experienced businessman with an expertise in the field of real estate development and financing. MBank was a financial institution involved in commercial real estate financing. Stewart acquired his interest in the Midland Note with the knowledge that his rights were subordinate to the senior lienholder, and subsequently reaffirmed his subordinate position in the Bailment Agreement. The Bailment Agreement did not limit Stewart from exercising his rights as a secured party on the Midland Note. Accordingly, jury questions 16 and 18, which inquired whether Bank One's and Trendmaker's bad faith was due to conscious indifference to the rights of Stewart and LRI, were immaterial.

Because there is no evidence to support the jury's findings to questions 9, 15(A), and 17, and the jury's findings to questions 16 and 18 were immaterial, the trial court committed reversible error when it entered judgment on the jury's findings to these questions. We therefore sustain Bank One's second point of error and Trendmaker's second and fourth points of error as to those claims.

### B. Fraud and Conspiracy to Commit Fraud

In its third point of error, Bank One contends the trial court erred in submitting questions 10, 11, and 11(A) because the evidence is legally and factually insufficient to support the jury's findings to these questions. In its second and fifth points of error, Trendmaker challenges the legal and factual sufficiency of the evidence to support the jury's answers to questions 10 through 11(D), and 22A through 22B on fraud and civil conspiracy to commit fraud, and asserts trial error in the submission of improper definitions of fraud and misrepresentation. In points three and four, Weyerhaeuser challenges the legal and factual sufficiency of the evidence to support the jury's findings of civil conspiracy to commit fraud. In points ten and eleven, Weyerhaeuser challenges the legal and factual sufficiency of the evidence to support the jury's findings of fraud in questions 22A and 22B.

Trendmaker and Weyerhaeuser assert the evidence is legally and factually insufficient to support a finding they defrauded Stewart and LRI. Stewart and LRI contend, however, that there is sufficient evidence that Trendmaker and Weyerhaeuser committed common-law fraud as well as fraud involving real estate transactions under Section 27.01 of the Texas Business and Commerce Code. Neither LRI nor Stewart submitted a statutory theory of fraud to the trial court; therefore, we restrict our analysis to the common law claim of fraud. *See* TEX.R.CIV.P. 279.

In questions 22A and B, the trial court instructed the jury that fraud "refers to an act, omission or concealment in intentional breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage." The

court further defined fraud and misrepresentation as follows:

a. A party makes a material misrepresentation,

b. The misrepresentation is made with the knowledge of its falsity or made without any knowledge of truth and as a positive assertion,

c. The misrepresentation is made with the intention that it should be acted on bey [sic] the other party, and

d. The other party acts in reliance on the misrepresentation and thereby suffers injury.

"Misrepresentation" means:

a. A false statement of fact, or

b. A promise of future performance made with an intent not to perform as promised.

 Trendmaker argues the first definition of fraud is improper because the words "trust or confidence justly imposed" do not apply to arms-length business transactions, but only to special relationships, and there is no evidence of a special relationship between Trendmaker and Stewart or LRI. Although no special relationship existed between Trendmaker and LRI or Stewart, the first definition of fraud is not fatally defective. With the exception of the word "intentional," the trial court took this definition of fraud from *Chien v. Chen*, 759 S.W.2d 484, 494 (Tex.App.—Austin 1988, no writ). Contrary to Stewart's and LRI's assertions, the *Chien* definition is not an alternative type of fraud giving rise to the breach of additional legal duties, but the general common-law definition of fraud. *Id.* Common law fraud includes actual fraud and constructive fraud. *See id.* at 494–495. Actual fraud involves dishonesty of purpose or intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty. *Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex.1986). By inserting the word "intentional" in the first definition, and enumerating the elements of actual fraud and defining misrepresentation in the second, the trial court limited the jury's consideration of Trendmaker's and Weyerhaeuser's alleged wrongful act to that of actual fraud.

 Trendmaker and Weyerhaeuser challenge the legal and factual sufficiency of the evidence to support a finding that Trendmaker and Weyerhaeuser committed actual fraud. LRI and Stewart[24] contend there is ample evidence Trendmaker signed the Midland Note and Trendmaker and Weyerhaeuser executed the Letter Guaranty with no intent to perform. "As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort. [citations omitted] However, when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud." *Crim Truck*, 823 S.W.2d at 597. "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa Plastics Corp. v. Presidio Engineers*, 960 S.W.2d. 41, 48 (Tex.1998). Failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made, but a circumstance to be considered with other facts to establish intent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986). Intent is a fact question. *Id.*

 Nevertheless, a joint venture, like a partnership, is an entity legally distinct from the partners. *Corinth Joint Venture v. Lomas & Nettleton Financial Corp.*, 667 S.W.2d 593, 595 (Tex.App.—Dallas 1984, writ dism'd). Because the Midland Note was a debt of the Midlands Associates, Stewart and LRI had to present evidence the Midlands Associates made representations with the intent to deceive and with no intention of performing as represented to recover on a claim of fraudulent inducement. *See Formosa*, 960 S.W.2d at 48. Moreover, the evidence presented must be relevant to the Midlands Associates's intent at the time the representation was made. *See id.*

---

**24.** The Midlands Associates addressed the Letter Guaranty to Ameriway and LRI. Representations made by both joint venturers expressly ran to the benefit of, and were enforceable by, the addressees, their successors and assigns, and the holders of the purchase money notes. Stewart brought suit for fraud as a collateral assignee of the Midland Note.

Viewing the evidence in the light most favorable to the verdict, we find no evidence the Midlands Associates made representations to facilitate the Bay Colony acquisition with an intention to not perform on the Midland Note. To facilitate the purchase of Bay Colony, Trendmaker and commonwealth Realty formed the Midlands Associates. The Midlands Associates borrowed money from LRI and executed the Midland Note in LRI's favor in March, 1985. In addition to the Midland Note, both venturers in the Midlands Associates signed a letter, addressed to Ameriway Savings and LRI, promising to perform specific terms of the Midlands Associates's joint venture agreement including (1) a promise that each joint venturers would contribute additional capital up to fifty percent of all sums due under the purchase money notes to the extent necessary to facilitate acquisition of the land, (2) an acknowledgment that failure to contribute the capital would be a default, and (3) an option that Trendmaker could advance Commonwealth Realty the necessary funds if Commonwealth were unable to perform. Representatives of each parent corporation also signed the letter guaranteeing the performance of each joint venturers to contribute capital to the venture (the Letter Guaranty).

For almost five years, Commonwealth Realty made quarterly payments on the Midland Note on behalf of the Midlands Associates. Trendmaker never made a payment on the Midland Note and did not reference a contingent liability on the note in its budget or financial statement. When questioned, Trendmaker's executive vice-president explained that during the early years Commonwealth agreed to provide capital for the obligations of the Midlands Associates and Trendmaker, believing Commonwealth would perform, saw "no reason to put a contingent liability of that sort in our plan." He further testified after Trendmaker withdrew from the joint venture, Trendmaker and Weyerhaeuser believed they had no obligation to the Midlands Associates and made no inclusion for capital contributions in Trendmaker's financial plan. Although Trendmaker made capital contributions to Midland Associates upon its withdrawal from the joint venture, it did not contribute capital specifi-cally designated toward payment of the Midland Note.

A joint venture is generally governed by the same legal rules as a partnership. *Joint Venture v. Spinks*, 873 S.W.2d 73, 76 (Tex. App.—Austin 1993, no writ). Among other powers, a partnership may incur liability and borrow money. TEX.REV.CIV. STAT. ANN. art. 6132b–3.01(5) (Vernon Supp.1997). In most cases, "a partnership agreement governs the relations of the partners and between the partners and the partnership." *Id.* art. 6132b–1.03. Here, to facilitate the purchase of Bay Colony, the Midlands Associates executed the Midland Note and signed the Letter Guaranty promising to repay the Midland Note as provided in their joint venture agreement. The joint venturers, however, did not adhere to the provisions of the written agreement or the Letter Guaranty in contributing capital to the venture for payment of the Midland Note. From this evidence, a jury might reasonably infer the Midlands Associates misrepresented the role of its respective members in contributing capital to the venture.

Generally, all partners are liable jointly and severally for all debts and obligations of the partnership. *Id.* art. 6132b, § 15. Even though Commonwealth Realty paid the Midland Note and Trendmaker contributed no capital for almost five years while Trendmaker was a party to the venture, the Midlands Associates met their obligation on the Midland Note. Therefore, a jury could not reasonably infer the Midlands Associates or the individual joint venturers did not intend to repay the Midland Note at the time it executed the Midland Note and the Letter Guaranty.

LRI and Stewart contend that partial performance is not necessarily indicative of an intent to fully perform as in *Dodson v. Sizenbach*, 663 S.W.2d 13 (Tex.App.—Houston [14th Dist.] 1983, no writ). *Dodson*, however, is factually distinguishable from this case. *Dodson* involved a fraud claim brought by two associates who co-signed a promissory note with Dodson in exchange for Dodson's promise to assign to them an option to acquire an interest in a development corpora-

tion and to assume the full obligation of the promissory note if the development corporation were not formed. *Id.* at 14. When Dodson failed to perform as promised, the two co-signers sued him for breach of contract and fraud. *Id.* at 15. Although Dodson initially paid the interest on the note, he testified that he never intended to pay on the note unless the project was successful and that he only intended to pay one-third of the interest and principal although he did not disclose his intent to the other co-signers. *Id.* at 15. This court found Dodson's testimony to reflect a present intent not to perform at the time he entered the contract giving rise to actionable fraud. *Id.*

Unlike the parties in *Dodson*, Ameriway and LRI were not parties to the joint venture and therefore had no cause of action against Trendmaker for its default. *See* Tex. Rev.Civ. Stat. Ann. art. 6132b–4.06 (Vernon Supp.1997) (stating a partnership may sue a partner for breach of the partnership agreement or for the violation of a duty to the partnership causing harm to the partnership). Unlike *Dodson*, no one from Trendmaker or Weyerhaeuser testified they intended to pay the Midland Note or perform under the Letter Guaranty only if the joint venture were successful. Instead, a Trendmaker representative stated that "the intent was to have a successful venture" and they did not contemplate not having to pay on the note or guaranty if the venture were unsuccessful.

Because the Midlands Associates initially performed on the Midland Note, we find no probative evidence to support the jury's finding that Trendmaker and Weyerhaeuser executed the Midland Note and Letter Guaranty with no intent to perform.

◼ Bank One, Trendmaker, and Weyerhaeuser further contend the evidence is legally and factually insufficient to support the jury's findings they participated in a civil conspiracy to commit fraud that proximately caused damage to Stewart and LRI. The jury found in response to questions 10 [25] and 11B the existence of a civil conspiracy to commit a fraud that proximately caused damage to Stewart and LRI. In answer to questions 11 and 11(A), the jury found Bank One, Bonnet Resources, Trendmaker, and Weyerhaeuser maliciously entered into a conspiracy against Stewart, and in questions 11(C) and 11(D), the jury found Trendmaker and Weyerhaeuser maliciously entered into a conspiracy against LRI. The trial court defined fraud in the general definition section in the same manner as in questions 22A and B.

◼ As a general rule, an actionable conspiracy must consist of wrongs that could have been actionable against the individual conspirators. *Ross v. Arkwright Mut. Ins. Co.*, 892 S.W.2d 119, 132 (Tex.App.—Houston [14th Dist.] 1994, no writ). A defendant's liability for conspiracy depends on its participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable. *Tilton v. Marshall*, 925 S.W.2d 672, 680 (Tex.1996). Therefore, if an act by one person cannot give rise to a cause of action, then the same act cannot give rise to a cause of action if done pursuant to an agreement between several persons. *Stroud v. VBFSB Holding Corp.*, 917 S.W.2d 75, 82 (Tex.App.—San Antonio 1996, writ denied). Because we find no evidence that Trendmaker and Weyerhaeuser committed fraud, we also find no liability for a conspiracy to commit fraud by Trendmaker and Weyerhaeuser against LRI and Stewart.[26]

◼ Furthermore, there is no evidence Bank One or Bonnet participated in a civil conspiracy to commit fraud with Trendmaker or Weyerhaeuser. During the sixty-day moratorium, LRI made no attempt to collect from Trendmaker on the Midland Note beyond making a demand on Trendmaker. Instead, Todd sought Trendmaker's assistance

---

**25.** Contrary to Stewart's assertion, Bank One specifically objected to the submission of Question No. 10 at trial and in its amended motion for new trial or to modify the judgment.

**26.** Moreover, a parent corporation cannot conspire with its fully owned subsidiary as a matter

of law. *Atlantic Richfield Co. v. Misty Products, Inc.*, 820 S.W.2d 414, 420 (Tex.App.—Houston [14th Dist.] 1991, writ denied). As the sole owner of Trendmaker, Weyerhaeuser could not maliciously conspire with Trendmaker to commit fraud against Stewart or LRI as a matter of law.

in restructuring the Bay Colony project and marketing it for sale. Although the sale of the LRI Note to Trendmaker approximately twenty months after the Midland Note default enabled Trendmaker to avoid liability on the Midland Note, there is no evidence Bank One or Bonnet conspired to commit fraud.

Because there is no evidence Trendmaker and Weyerhaeuser committed fraud, and there is no evidence Trendmaker, Weyerhaeuser, Bank One or Bonnet conspired to commit fraud against LRI or Stewart, the trial court committed reversible error in submitting questions 10 through 11D and 22A and B to the jury and in entering judgment on the jury's findings. Bank One's third point of error, Weyerhaeuser's third, fourth, tenth and eleventh points of error, and Trendmaker's second and fifth points of error are sustained as to those claims.

### C. Tortious Interference with a Contract and Business Relations

In its fifth through ninth points of error, Weyerhaeuser asserts the evidence is legally and factually insufficient to support the jury's findings of tortious interference with Stewart's and LRI's contractual and business relations with Bank One. Likewise, in its second point of error, Trendmaker challenges the sufficiency of the evidence to support the same finding with regard to its actions.

█ Stewart contends Trendmaker caused Bank One to breach the Bailment Agreement by transferring the Bailment Agreement to Trendmaker at the time Trendmaker took delivery of the Midland Note. The jury found in answer to questions 12, 12A, and 13 that Trendmaker and Weyerhaeuser, without justification, maliciously and tortiously interfered with the business relations between Stewart and Bank One concerning the notes, Bailment Agreement, or Assumption Agreement. We have already found that Bank One did not breach the Bailment Agreement at the time it assigned the Midland Note to Trendmaker pursuant to Trendmaker's purchase of the LRI Note. Therefore, neither Trendmaker nor Weyerhaeuser could have tortiously interfered with

Stewart's contractual relationship with Bank One.

Stewart further contends Trendmaker caused LRI to default on its note to Stewart by intentionally breaching the Midland Note. Stewart, however, does not complain about the trial court's failure to submit a question regarding Trendmaker's or Weyerhaeuser's alleged tortious interference with Stewart's relationship to LRI. Therefore, Stewart has waived this argument on appeal. TEX. R.APP.P. 74(f).

█ LRI alleges Trendmaker willfully and intentionally breached the Midland Note to cause LRI to breach its obligations to Bank One under the LRI Note and then deliberately took advantage of LRI's breach to acquire the LRI Note at a discount, "followed by a series of sham foreclosure sales to obtain control of the Midland Note and the underlying real estate." The jury agreed and in answer to questions 14, 14A, and 15 found Trendmaker and Weyerhaeuser, without justification, maliciously and tortiously interfered with the note and business relations between LRI and Bank One.

█ Generally, the failure to perform the terms of a contract is a breach of contract, not a tort. *Crim Truck*, 823 S.W.2d at 597. A knowing and intentional breach of one's contract, however, may be an act of tortious interference with a third party's contract if the breach has the purpose and effect of preventing the third party from performing its contract with another. *American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274, 279 (Tex. 1990). A party alleging tortious interference must prove four elements to sustain its claim: (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred. *ACS Investors*, 943 S.W.2d at 430. Even if the plaintiff proves a tortious interference, the defendant may still prevail if it establishes the affirmative defense of justification. *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex.1996). A party is justified in interfering with another's con-

tract if it exercises (1) its own legal rights or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Id.*

The trial court defined willful and intentional to mean "that a party desires to interfere or knows that his act is substantially certain or reasonably calculated to cause interference. In other words, that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." In addition to stating the definition of tortious interference by breach of one's direct contract under *American National*, the trial court defined tortious interference as "such conduct or action which has as its purpose to influence others not to carry out the terms and conditions of their contracts with the injured party or to prevent the injured party in carrying out the terms and conditions of the contract."

At the time Midland Associates defaulted on the Midland Note, a valid promissory note existed between Bank One and LRI. Trendmaker was aware the Midland Note was the sole asset of LRI, and LRI defaulted on its note to Bank One as a result of the Midland default. Although the effect of Trendmaker's refusal to pay the Midland Note prevented LRI from performing its contract with Bank One, there is no evidence Trendmaker purposefully engaged in a course of action to influence Bank One to dishonor, subvert, or breach its contract with LRI or to prevent LRI from performing on the LRI Note. *See American Nat'l*, 798 S.W.2d at 279 (finding purposeful course of action to interfere with contracts). At the time Midland Associates defaulted on the Midland Note, Trendmaker was no longer a party to the joint venture. When informed approximately two years after its withdrawal that Midland Associates had defaulted on the note and pressed to confront its apparent liability on the note as an original maker, Trendmaker threatened to assert various defenses including withdrawal and indemnification if a demand were made. To cover its apparent liability, Trendmaker sought to purchase the LRI Note from Bank One, and thus acquire access to the Midland Note. Merely inducing a contract obligor to

do what it has a right to do is not actionable interference. *ACS Investors*, 943 S.W.2d at 430. Bank One was authorized to sell the LRI Note to any qualified buyer, including Trendmaker.

After Bank One declined its initial offer to purchase the LRI Note, Trendmaker delayed Bank One's foreclosure of the Midland Note by funding Todd's bankruptcy. When the bankruptcy stay was lifted, Trendmaker resumed negotiations with Bank One and purchased the LRI Note with funds Weyerhaeuser provided. Trendmaker eventually acquired the Midland Note and its underlying real estate through a series of foreclosure sales, and then entered into an agreement with the RTC to market Bay Colony for a minimum of $2,750,000, the amount it paid for the LRI Note.

There is no evidence Weyerhaeuser tortiously interfered with LRI's contract or business relationship with Bank One. The only evidence of Weyerhaeuser's involvement in the purchase of the LRI Note is a brief discussion between officers of Trendmaker and Weyerhaeuser regarding Trendmaker's overall strategy to avoid liability on the Midland Note and Weyerhaeuser's loan to Trendmaker that enabled Trendmaker to purchase the LRI Note.

Because there is no evidence Trendmaker and Weyerhaeuser tortiously interfered with a contract or business relationship between LRI and Bank One or between Stewart and Bank One, the trial court erred in entering judgment on the jury's findings to questions 12 through 15. We sustain Weyerhaeuser's fifth through ninth points of error and Trendmaker's second point of error as to its claim of tortious interference.

### D. Conversion

 In its second point of error, Trendmaker challenges the legal and factual sufficiency of the evidence to support the judgment based on the jury's answers to questions 20–B and 20–C. In its twenty-ninth point of error, Weyerhaeuser asserts the same complaint and adopts Trendmaker's argument. In answer to question 20–B, the jury found Trendmaker converted the Midland Note by foreclosing on the note causing

damage to Stewart and LRI. In answer to question 20–C, the jury found Trendmaker converted the Midland Note with conscious indifference to the rights of Stewart or LRI. Conversion, as defined by the trial court, is the "unauthorized and unlawful assumption and exercise of dominion and control over personal property which is to the exclusion of, or inconsistent with, the rights of another person in the property." *See Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971); *see also Whitaker v. Bank of El Paso*, 850 S.W.2d 757, 760 (Tex.App.—El Paso 1993, no writ).

Stewart and LRI contend "Trendmaker's liability for conversion is based on wrongfully acquiring and possessing the Midlands Note, and on repudiating the rights of LRI and Stewart by holding a sham foreclosure sale." There is no evidence, however, that Trendmaker wrongfully acquired and possessed the Midland Note. "In the normal course of purchasing real estate notes or debt instruments, it is the usual practice and to be expected that the purchaser get the benefit of the collateral securing the obligations purchased." *Ravkind v. Mortgage Funding Corp.*, 881 S.W.2d 203, 206 (Tex.App.—Houston [1st Dist.] 1994, no writ). Here, Trendmaker lawfully acquired its security interest in the Midland Note when it purchased the LRI Note from Bank One.

Stewart and LRI further argue, however, that even if Trendmaker lawfully acquired an interest in the Midland Note, it had no right to foreclose on the LRI Note because Trendmaker caused LRI to default on its note. Furthermore, they maintain, Trendmaker's position as a secured party and a debtor in the same transaction created a conflict of interest that resulted in Trendmaker's attempt to steal the Midland Note. Unlike a normal secured party who seeks only to be repaid on its debt, Stewart and LRI argue, Trendmaker sought to escape liability on the Midland Note in spite of LRI's demand that Trendmaker pay the LRI Note by a credit from the Midland Note and in spite of Stewart's pending lawsuit seeking to enforce the Midland Note.

While there is some evidence Trendmaker's refusal to pay on the Midland Note may have prevented LRI from curing its default, there is no evidence Trendmaker caused LRI to default on the LRI Note. LRI defaulted on its note because Midland Associates defaulted on the Midland Note, LRI's sole asset. At the time of the Midland and LRI default, Trendmaker was no longer a party to Midland Associates, although it remained an apparent obligor on the Midland Note. Moreover, when it purchased the LRI Note, Trendmaker became the principal obligee on the note with the authority to declare LRI in default and to make a demand for payment. In addition, Trendmaker could foreclose on the Midland Note after the LRI default because it held a security interest in the Midland Note. *See* TEX.BUS. & COM.CODE ANN. § 9.504 (Vernon 1991). Neither Stewart nor LRI cites any authority, and we have found none, that prohibits a secured party from foreclosing on collateral because the secured party's intent is something other than repayment of the debt or because the secured party has acquired its own debt. Furthermore, Trendmaker's purchase of the LRI Note did not preclude Stewart or LRI from foreclosing or suing on the Midland Note, or from purchasing the Midland Note at Trendmaker's foreclosure sale.

The trial court erred in granting judgment on the jury's findings to questions 22–B and 22–C because there is no evidence Trendmaker converted the Midland Note to Stewart's or LRI's detriment. We sustain Trendmaker's second point of error and Weyerhaeuser's twenty-ninth point of error.

Moreover, there is no evidence the conduct of Bank One, Trendmaker, and Weyerhaeuser gave rise to liability independent of the Bailment Agreement and the Midland Note. Therefore, Trendmaker's claims sound in contract alone. We sustain Trendmaker's third point of error.

## VI. Commercially Reasonable Foreclosure Sale

In its second point of error, Trendmaker challenges the evidence to support the jury's answer to question 21 and the trial court's judgment that it failed to conduct the public foreclosure sale of the Midland Note in a commercially reasonable manner. In its

twenty-eighth point of error, Weyerhaeuser also challenges the sufficiency of the evidence to support the trial court's judgment finding Weyerhaeuser liable for Trendmaker's conduct in the foreclosure sale and adopts Trendmaker's arguments.

After default by the debtor, a secured creditor may sell, lease, or otherwise dispose of any collateral securing payment of the debt. TEX.BUS. & COM.CODE ANN. § 9.504(a) (Vernon 1991). Every aspect of a sale or other disposition of collateral by a secured party, however, including the method, manner, time, place and terms, must be commercially reasonable and the secured party must give the debtor reasonable notice of the time and place of the sale. *Id.* § 9.504(c).

A secured party sells collateral in a commercially reasonable manner if it sells the collateral (1) in the usual manner in any recognized market; (2) at the price current in the market at the time of the sale; or (3) in conformity with reasonable commercial practices among dealers in the type of property sold. *Id.* § 9.507(b). Factors useful in determining whether the secured party acted within the bounds of commercial reasonableness are whether (1) the secured party endeavored to obtain the best price possible; (2) the property was available for inspection before the sale; (3) the collateral was sold in bulk or piecemeal; (4) it was sold via private or public sale; (5) it was sold at a propitious time; and (6) the expenses incurred during the sale were reasonable and necessary. *Havins v. First Nat'l Bank of Paducah,* 919 S.W.2d 177, 181 (Tex.App.—Amarillo 1996, no writ). Whether a disposition is commercially reasonable involves balancing the competing policy interests of preventing dishonesty with the need to minimize interference. *Id.* Because the question is inherently a factual issue, resolution depends upon the totality of the circumstances particular to each case. *Id.*

Stewart and LRI contend the sale was commercially unreasonable because Trendmaker provided only seventeen days notice of the sale to Stewart, fourteen days notice to LRI, and ten days notice to potential bidders in the *Wall Street Journal* and other papers. They claim these time periods were inadequate to attract independent bidders who needed to evaluate the underlying real estate and raise money. Trendmaker, however, asserts seventeen days notice conforms with reasonable commercial practices among those who deal with foreclosures of promissory notes.

In conducting a public sale of collateral, as in this case, a secured creditor must give reasonable notice of the time and place of the sale to the debtor and other secured parties with an interest in the collateral. TEX.BUS. & COM.CODE ANN. § 9.507(b) (Vernon 1991). The purpose of the required notice is to allow the debtor an opportunity to protect his interest in the collateral. *MBank Dallas v. Sunbelt Mfg.,* 710 S.W.2d 633, 636 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). "The debtor must have enough notice to enable him to redeem the property himself, find other buyers for the property, or ensure that the sale is a commercially reasonable one." *Knights of Columbus Credit Union v. Stock,* 814 S.W.2d 427, 430 (Tex.App.—Dallas 1991, writ denied).

No evidence was presented to show that the time periods regarding notice of sale were commercially unreasonable. James Box, LRI's designated expert on commercial reasonableness, did not state an opinion on the adequacy of the notice, although he discussed the length of time necessary to conduct a field study on the real property. Box conceded that he was not an expert in the law of commercial reasonableness under the Uniform Commercial Code and had never participated in a foreclosure proceeding. Chelsey Brooks, Jr., Stewart's expert on commercially reasonable collection efforts by a bank, testified over objection, that "there is a magic number that is required by law," but admitted that he was not a lawyer. Although Brooks was unable to give a concrete opinion as to what would constitute a normal amount of time to give notice of the sale of notes secured by real estate, he suggested from a business perspective that he might give more time than is statutorily required if "there is enough interest and people are still calling."

On the other hand, some evidence was presented that the seventeen-day notice was commercially reasonable. Trendmaker's expert in the commercial practice of UCC foreclosures, Robert Shearer, testified that seventeen days was a reasonable notice period among those who engage in selling promissory notes. He further stated that ten days notice of foreclosure is customary in the collateral assignments that he prepares and that State Bar of Texas forms provide for ten days notice. Shearer also observed that at the same time the notice of the sale of the Midland Note appeared in the newspaper, a similar advertisement, sale of another promissory note secured by real estate, appeared that provided only nine days notice.

In addition, Stewart and LRI had ample opportunity to protect their interests. LRI defaulted on its note approximately twenty months before Trendmaker foreclosed on the Midland Note. During that time, Bank One posted the Midland Note for foreclosure, Todd unsuccessfully sought a third-party purchaser to buy Bay Colony, and Stewart unsuccessfully sought financing to purchase the LRI Note. After receiving notice of the foreclosure sale, Stewart sought injunctive relief, which the federal court denied, and LRI sent a letter of protest to Trendmaker complaining of the unreasonableness of the foreclosure sale. Both LRI and Stewart sent representatives to the foreclosure sale.

■ Stewart and LRI also complain that the manner in which Trendmaker conducted the sale was commercially unreasonable. They argue Trendmaker did not act in good faith because Trendmaker's motive in conducting the sale was to escape a bad bargain and not to make a sincere effort to obtain the full market price of the collateral. They further argue Trendmaker pursued foreclosure as a matter of form rather than as an effort to sell the note on a commercially reasonable basis.

"The principal limitation on the secured party's right to dispose of collateral is the requirement that he proceed in good faith (Section 1–203) and in a commercially reasonable manner." TEX.BUS. & COM.CODE ANN. § 9.507 cmt. 1 (Vernon 1991). Good faith means honesty in fact in the conduct or transaction concerned. *Id.* § 1.201(19); *see also Federal Deposit Ins. Corp. v. Coleman,* 795 S.W.2d 706, 708 (Tex.1990) (duty of good faith requires honesty in fact and not diligence for good faith). Jury question 21 did not inquire whether Trendmaker acted in good faith in conducting the foreclosure sale, although it instructed the jury that Trendmaker was obligated to act in good faith in disposing of the collateral note. Because Stewart and LRI do not complain about the absence of a jury finding on this issue, they have waived this complaint on appeal. TEX. R.APP.P. 74(f).

■ Commercial reasonableness requires the creditor to make a sincere effort to obtain the full market value for the collateral. *See United States v. Terrey,* 554 F.2d 685 (5th Cir.1977); TEX.BUS. & COM.CODE ANN. § 2.706 cmt. 4 (Vernon 1994) (stating purpose of commercial reasonableness standard to enable seller to realize as high a price as possible).[27] While neither Stewart nor LRI

---

27. Based on the commercial reasonableness standards, some courts have held that the secured party must act as the debtor's fiduciary if he decides to liquidate the collateral. See *Terrey,* 554 F.2d at 693; *Lee v. Sabine Bank,* 708 S.W.2d 582, 584 (Tex.App.—Beaumont, 1986, writ ref. n.r.e.) (trust arrangement); *Christian v. First Nat. Bank of Weatherford,* 531 S.W.2d 832, 839 (Tex. Civ.App.—Fort Worth 1975, writ ref'd n.r.e.) (fiduciary duty to sell property in commercially reasonable manner). Nevertheless, Section 9.504 follows the provisions of the Uniform Trust Receipts Act which provides that "an entruster in possession after default holds the collateral with the rights and duties of a pledgee, and in particular, that he may sell such collateral at public or private sale with a right to claim deficiency and a duty to account for any surplus." TEX BUS. & COM.CODE ANN. § 9.504 cmt. 1 (Vernon Supp. 1997). Moreover, the requirement of commercial reasonableness in Section 9.504 follows the provisions of Section 2–706 regarding the resale of goods by a seller following a buyer's rejection of goods. *Id.* Under Article 2, "the seller resells by authority of law, in his own behalf, for his own benefit and for the purpose of fixing his damages. The theory of a seller's agency is thus rejected." TEX.BUS. & COM CODE ANN. § 2.706 cmt. 2 (Vernon 1994). Instead, a secured party is a trustee in a qualified sense. *See Kolbo v. Blair,* 379 S.W.2d 125, 131 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n.r.e.) (offering Pre–Code explanation for chattel mortgagee's duty to himself and mortgagor). The secured party holds the collateral for his own benefit and not for the

complain Trendmaker purchased the property for less than its fair market value,[28] they do contend that Trendmaker pursued the foreclosure sale as a matter of form and did not actively solicit potential bidders.

The record reflects some evidence that Trendmaker did not proceed in a commercially reasonable manner in advertising the foreclosure sale. Michael Kuhn, Trendmaker's attorney, testified when prospective bidders called, he responded to questions they posed and made documents available for inspection. He admitted he misquoted the balance on the Midland Note to one of several prospective bidders because the fact sheet from which he was reading stated the wrong interest. Kuhn admitted that, when asked by a prospective bidder who signed the Midland Note, he informed the bidder Midland Associates signed the note. When asked who composed Midland Associates, Kuhn responded that two Commonwealth entities composed the joint venture and did not tell the prospective bidder that Trendmaker had been one of the parties who signed the note. Kuhn also stated he did not contact persons who had previously made offers on Bay Colony to notify them of the foreclosure sale. James Box, LRI's expert, confirmed his employer never received notice of the foreclosure sale, even though Trendmaker knew his employer might have been interested in Bay Colony.

Chester Brook, Stewart's expert, testified over objection that giving the wrong balance to prospective buyers is a "nightmare." He criticized Trendmaker's efforts to advertise the foreclosure sale and stated he would have advertised the sale by putting together a flyer or a little brochure reflecting "that

Midlands was composed of Trendmaker and Commonwealth" to distribute to interested parties. After informing prospective buyers, of the pending sale he would have provided information on how they could acquire additional information.

Although there was no evidence the length of notice was commercially unreasonable, the record reflects some evidence that Trendmaker proceeded in a commercially unreasonable manner in advertising the sale. We overrule Weyerhaeuser's twenty-seventh point and Trendmaker's second point of error as to the commercial reasonableness claim.

## VII. Damages, Prejudgment Interest, and Attorney Fees

In its fifth through eighth points of error, Bank One challenges the legal and factual sufficiency of the evidence to support the submission of issues related to damages and attorney fees, and the award of damages and fees in the judgment based on the jury's findings. Trendmaker also challenges the sufficiency of the evidence to support damages and fees in its sixth through eighth points, as does Weyerhaeuser in its fifteenth and sixteenth points of error. The Texas Supreme Court recently held the following: "[T]o recover damages, a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant. This causal nexus requirement is met when a jury is presented with pleading and proof that establish a direct causal link between the damages awarded, the actions of the defendant and the injury suffered." *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d

---

benefit of others. *Id.* As the Corpus Christi Court explained:

> He is a cestui que trust, as well as trustee.... He has an interest that the bid should amount to his encumbrance, and that the property be not sacrificed, to the injury as well of the mortgagor as the defeat of his own claim; as this may be the only fund for the discharge of his debt.... It is his duty to sell at the highest possible price; if he purchase, his interest would be to purchase at the lowest possible price; as seller and purchaser he is charged with the possibility of an adverse interest.

*Id.* Because of this adverse interest, pre-code courts examined the "sale from its four corners

and required the mortagee to prove by clear and convincing evidence that such sale was fairly and honestly conducted in all respects." *Id.* Likewise, Section 9.507 provides a remedy should the secured party dispose of collateral in a commercially unreasonable manner. Tex.Bus. & Com.Code Ann. § 9.507 cmt. 1 (Vernon 1991).

28. "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." Tex.Bus. & Com.Code Ann. § 9.507(b) (Vernon 1991).

179, 181 (Tex.1995). Recovery of punitive damages requires a finding of an independent tort with accompanying actual damages. *Federal Expr. Corp. v. Dutschmann,* 846 S.W.2d 282, 284 (Tex.1993). Moreover, attorney fees are not recoverable except where expressly provided by statute or contract. *Dallas Central Appraisal Dist. v. Seven Inv. Co.,* 835 S.W.2d 75, 77 (Tex.1992).

### A. Bank One

■ Stewart complains that Bank One's decision to apply the LRI and Midland Notes in the manner most beneficial to the bank, as allowed by the applicable documents, indirectly led to the destruction of Stewart's subordinate interest in the Midland Note. Stewart fails to cite, and we have not located, any authority upholding a right of action in favor of a party damaged only indirectly by a secured lender's conduct. *See Walther,* 772 F.Supp. at 765. Bank One did not breach the Bailment Agreement or violate any express or implied duties created by the agreement, by its relationship with Stewart, or under Section 9.207(a) of the business and commerce code. Bank One, as a matter of law, did not engage in a civil conspiracy to commit fraud. Consequently, the trial court abused its discretion in submitting questions regarding actual and punitive damages to the jury and erred in granting judgment on the basis of the jury's findings. There are no grounds upon which the jury could find, and the trial court award, damages, prejudgment interest, and attorney fees against Bank One. We sustain Bank One's fifth through eighth points of error.

### B. Trendmaker and Weyerhaeuser

■ Stewart and LRI complain that Trendmaker, by purchasing its own debt instead of paying the Midland Note, avoided liability on its debt, purchased the real estate underlying its debt, and recovered the cost of its investment by entering an agreement to market the underlying real estate while Stewart and LRI remained unpaid. There is no evidence, however, that Trendmaker breached the Bailment Agreement or committed an independent tort upon which the trial court could award actual or punitive damages. On the other hand, there is some evidence Trendmaker failed to conduct the foreclosure sale of the Midland Note in a commercially reasonable manner.

Trendmaker, nevertheless, asserts trial error in awarding actual damages based on the latter finding because Stewart and LRI suffered no compensable loss as a result of the foreclosure sale under the rules governing priority, and incurred no damages because of Trendmaker's purchase of the LRI Note. In response to questions 23 and 23A, the jury awarded Stewart actual damages of $1,500,000 and LRI actual damages of $3,400,000. The trial court instructed the jury to consider the value of Stewart's and LRI's interest in the Midland Note and to award damages based on the amount that would have been recovered for their benefit under the note.

■ If it is established the secured party did not dispose of the collateral in a commercially reasonable manner, the debtor or any person entitled to notification has a right to recover from the secured party any loss caused by the secured party's failure to proceed in a commercially reasonable manner. TEX.BUS. & COM.CODE ANN. § 9.507(a) (Vernon 1991); *First City Bank–Farmers Branch, Texas v. Guex,* 677 S.W.2d 25, 29 (Tex.1984) (noting debtor's right to actual damages or statutory penalty if collateral is consumer goods). Under Section 9.507(a) the recovery of damages is the economic loss sustained by noncompliance with the notice requirements. *Barr v. White Oak State Bank,* 677 S.W.2d 707, 711 (Tex.App.—Tyler 1984, writ ref'd n.r.e.); *Food City, Inc. v. Fleming Co.,* 590 S.W.2d 754, 761 (Tex.Civ. App.—San Antonio 1979, no writ). "However, a debtor has no right to affirmative relief unless he can show that the fair market value of the collateral at the time of taking exceeded the unpaid balance of the indebtedness inclusive of interest and other lawful charges." *ITT Commercial Fin. Corp. v. Riehn,* 796 S.W.2d 248, 255 (Tex.App.—Dallas 1990, no writ).

Here, neither Stewart nor LRI suffered any loss due to Trendmaker's failure to conduct a commercially reasonable sale. Under Section 9.504(a) governing the order in which proceeds of a disposition are to be applied, Trendmaker's interest in the LRI Note

would have been satisfied first by the sale of the Midland Note, followed by Stewart's subordinate interest in the Stewart Note, with any surplus flowing to LRI, the debtor. TEX. BUS. & COM.CODE ANN. § 9.504(a)(2), (3), & (4) (Vernon 1991). The jury found in answer to question 23C that the fair market value of the Midland Note at the time of Trendmaker's foreclosure was $4,000,000. Trendmaker's first lien debt on the LRI Note was $5,700,000, exceeding the fair market value of the Midland Note by $1,700,000. Thus, even if the Midland Note had been sold for $4,000,000, Trendmaker's full interest in the LRI Note would not have been satisfied and neither Stewart nor LRI would have recovered any proceeds resulting from the sale.

Stewart contends the jury's finding as to the fair market value of the Midland Note does not defeat his recovery because this finding may be reconciled with the jury's award of $1,500,000 in actual damages. A court may not strike down a jury's answer on the ground of fatal conflict if there is "any reasonable basis upon which they can be reconciled." *International Piping Sys. v. M.M. White & Assoc.*, 831 S.W.2d 444, 451 (Tex.App.—Houston [14th Dist.] 1992, writ denied). Stewart contends the jury's finding of the value of the Midland Note is based on the value of the note after deducting the value of Trendmaker's first lien debt or selling the note subject to the final lien debt.

Question 23C inquired "[w]hat was the fair market value of the Midlands Note on the date of the foreclosure sale of the Midlands Note conducted by Trendmaker on August 19, 1991?" The trial court instructed the jury that the " 'fair market value' means the amount at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." The jury was not asked to deduct the value of any debt or to make any other mathematical computations in arriving at the fair market value of the note.

As to Stewart's actual damages, the trial court instructed the jury that the value of Stewart's security interest in the Midland Note is the amount that would have been recovered for his benefit under the Midland Note and that the amount may be less than, but in no event could be no more than, the amount owed to him under the Stewart Note. Stewart provided $1,500,000 in financing to LRI secured by an interest in the Midland Note. We find no fatal conflict between the jury's findings regarding Stewart's actual damages and the value of the Midland Note. The jury's findings as to the fair market value of the Midland Note and Stewart's damages as related to the LRI Note merely confirmed, as a matter of law, that Stewart suffered no loss from Trendmaker's failure to conduct a commercially reasonable sale.

Because Stewart and LRI suffered no actual loss as a result of Trendmaker's failure to conduct the foreclosure sale of the Midland Note in a commercially reasonable manner and because there was no evidence of an independent tort giving rise to actual or punitive damages, the trial court erred in awarding actual and exemplary damages, prejudgment and postjudgment interest and attorney fees to Stewart and LRI. We sustain Trendmaker's sixth through eighth points of error.

Moreover, because Stewart's and LRI's claims against Weyerhaeuser are derivative of Trendmaker's liability, the trial court erred in awarding the same judgment against Weyerhaeuser. Weyerhaeuser's fifteenth and sixteenth points of error are sustained.

## VIII. Additional Points of Error and Cross–Points

Because of our disposition of the points of error raised by Bank One, Trendmaker, and Weyerhaeuser, we need not address their remaining points of error.

By cross-point, Stewart complains he was entitled to attorney fees based on a percentage of the exemplary damages awarded by the trial court. LRI complains by cross-point of the award of attorney fees and prejudgment and postjudgment interest on actual damages. Because we reverse and render judgment against Stewart and LRI, we need not address these issues on appeal.

■ Both Stewart and LRI raise a conditional cross-point seeking an award of damages based on the most favorable remedy. When a jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive alternative findings, and thus may seek recovery under an alternative theory if the judgment on one theory is reversed on appeal. *Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex.1988). The jury, in this case, found against Trendmaker on every theory of recovery alleged by Stewart and LRI. The trial court rendered judgment against Trendmaker on the jury's verdict, but it did not mention or refer to any specific ground of recovery upon which it based its judgment.

Specifically, LRI seeks rescission of the foreclosure sale and enforcement of the Midland Note based on the jury's findings of fraud, conspiracy to commit fraud, conversion, and a commercially unreasonable sale. Because the evidence does not support the jury's findings of fraud, conspiracy to commit fraud and conversion, we do not address whether LRI is entitled to rescission. Nevertheless, there is some evidence supporting the jury's finding that Trendmaker did not conduct the foreclosure sale in a commercially reasonable manner. Therefore, we consider whether LRI and Stewart are entitled to recission of the foreclosure sale and enforcement of the Midland Note as most favorable remedy under Section 9.507 of the business and commerce code.

■ Recission is an equitable remedy that may be granted upon certain grounds such as fraud. *Shenandoah Assoc. v. J & K Properties, Inc.*, 741 S.W.2d 470, 475 (Tex. App.—Dallas 1987, writ denied). Generally, "[t]he defrauded purchaser is put to an election whether he will keep the property and recover damages, or rescind the sale and return the property while recovering the value he has parted with." *Id.* To be entitled to rescission, a party must show (1) he and the defrauding party are in the status quo, that is, he is not retaining benefits received under the instrument without restoration to the other party; or (2) there are equitable considerations that obviate the need for the sta-

tus quo relationship. *Id.* (citing *Boyter v. MCR Construction Co.*, 673 S.W.2d 938, 941 (Tex.App.—Dallas 1984, writ ref'd n.r.e.)).

■ Here, Stewart elected to recover at law for damages instead of recission; therefore, he is barred from seeking cancellation of the sale. *Id.* LRI, on the other hand, elected cancellation of the foreclosure sale and enforcement of the Midland Note, but the trial court granted damages on the jury's findings. LRI, however, did not satisfy its obligation to Trendmaker on the LRI Note. Therefore, LRI is not entitled to recission of the sale. *See Fireman's Fund Ins. Co. of Texas*, 704 S.W.2d at 135; *Pachter v. Woodman*, 534 S.W.2d 940, 946 (Tex.Civ.App.—Tyler 1976) (holding to seek equity, one must do equity), *reversed on other grounds*, 547 S.W.2d 954 (Tex.1977).

■ Arguably, the relationship of LRI and Trendmaker on the Midland Note is an equitable consideration that might obviate the need for the status quo relationship and permit recission of the sale. Section 9.507, nevertheless, does not permit a court to rescind a foreclosure sale of personal property. Instead, Section 9.507 limits a debtor's remedy for the failure to conduct a commercially reasonable sale of personal property to the recovery of damages or protection from a deficiency judgment. *See Tanenbaum v. Economics Laboratory, Inc.*, 628 S.W.2d 769 (Tex.1982) (holding a chattel mortgagee must conduct a commercially reasonably foreclosure sale to recover a deficiency based on the bid amount). Although Section 9.507 provides that a secured party proposing to dispose of collateral in an unreasonable manner may, by court order, be restrained from doing so or ordered to dispose of the collateral on appropriate terms and conditions, it "further provides for damages where the unreasonable disposition has been concluded, and, in the case of consumer goods, states a minimum recovery." TEX.BUS. & COM.CODE ANN. § 9.507(a) cmt. 1 (Vernon 1991).

In its motion for rehearing, LRI argues that Section 9.507 does not state an exclusive remedy, and that recission is an available remedy for a sale that is voidable in equity. LRI correctly states that pre-code cases al-

lowed for recission of non-judicial sales of chattel mortgages. *See Kolbo*, 379 S.W.2d at 132 (private sale pursuant to power contained in chattel mortgage not fairly conducted); *Fireman's Fund Ins. Co. v. Wilson*, 284 S.W. 920, 921 (Tex. Comm'n App.1926, judgm't adopted) (failure to strictly comply with terms of chattel mortgage renders sale void); *King v. Boerne State Bank*, 159 S.W. 433, 437 (Tex.Civ.App.—San Antonio, 1913 writ ref'd) (choice of remedy where stock converted); *First Nat'l Bank v. Mings*, 11 Tex.Civ. App. 302, 32 S.W. 178, 179–80 (1895, writ ref'd) (claim of conversion for failure to give notice of sale of stock securing note). Moreover, at least one sister court recognizes a presumption that recission is available to set aside a sale of personal property for improper notice of the sale as required by the security agreement and Section 9.504 if the debtor satisfied its debt to the holder of the debt. *See Fireman's Fund Ins. Co. of Texas v. Jackson Hill Marina, Inc.*, 704 S.W.2d 131, 135 (Tex.App.—Tyler 1986, writ ref'd n.r.e.) (bank's failure to comply with notice provisions of security agreement or reasonable notice requirements under Section 9.504(c) does not invalidate purchase because no attempt to set aside sale). Furthermore, under the common law, a party may elect to let a nonjudicial sale under a deed of trust stand and recover at law for damages or seek an equitable claim for cancellation. *Owens v. Grimes*, 539 S.W.2d 387, 390 (Tex.Civ.App.—Tyler, writ ref'd n.r.e.).

Notwithstanding the availability of recission prior to the adoption of the Uniform Commercial Code and in other areas of the common law, we decline to impose an equitable remedy where the Code provides an adequate legal remedy and at the same time permits additional claims giving rise to equitable remedies as long as the claims do not conflict with the provisions of the Code. *See* TEX.BUS. & COM.CODE ANN. § 1.103 (Vernon 1994) (preserving the principles of law and equity common-law claims unless displaced by particular provisions of the code); *Garcia v. Texas Instruments, Inc.*, 610 S.W.2d 456, 462 (Tex.1980) (holding the Code establishes an alternative remedy to tort remedies for injuries arising from same set of facts); *Miller–Rogaska, Inc. v. Bank One, Texas, N.A.*, 931 S.W.2d 655, 662 (Tex.App.—Dallas 1996, no writ) (stating provisions of Uniform Commercial Code displaced common-law claim of conversion where plaintiff was not a holder of the negotiable instrument as required by the Code). "[T]he Code was drafted specifically to govern commercial losses and obviously provides the proper remedies to recover such losses." *Nobility Homes of Texas v. Shivers*, 557 S.W.2d 77, 80 (Tex.1977). Because Section 9.507(a) provides for damages, LRI is not entitled to recission of the foreclosure sale.

LRI also argues in its motion for rehearing that it is entitled to enforce the Midland Note under several other provisions of the business and commerce code. LRI, however, did not submit any element of recovery on the Midland Note to the jury. Consequently, LRI waived this theory of recovery. *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex.1991). Because LRI is not entitled to recission of the foreclosure sale under Section 9.507(a) and enforcement of the Midland Note and because Stewart elected damages instead of recission, we overrule LRI's third cross-point and Stewart's second cross-point of error.

By cross-point, Stewart complains he was entitled to attorney fees based on a percentage of the exemplary damages awarded by the trial court. LRI complains by cross-point of the award of attorney fees and prejudgment and postjudgment interest on actual damages. Both Stewart and LRI raise a conditional cross-point seeking an award of damages based on the most favorable remedy. Because we reverse and render judgment against Stewart and LRI, we need not address these issues on appeal.

Accordingly, we reverse the judgment of the court below, and render judgment that Stewart and LRI take nothing against Bank One, Bonnet Resources, Trendmaker, and Weyerhaeuser.